Charles R. Gibbs (SBN: 07846300)
Eric T. Haitz (*pro hac vice* application pending)
AKIN GUMP STRAUSS HAUER & FELD LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201
(214) 969-2800 (Telephone)
(214) 969-4343 (Facsimile)

*Counsel for*
*COMM 2015-CCRE22*
*EAST CENTRAL TEXAS*
*EXPRESSWAY, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OMNI LION'S RUN APARTMENTS, L.P. | ) | Case No. 17-60329 (RBK) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## MOTION OF COMM 2015-CCRE22 EAST CENTRAL TEXAS EXPRESSWAY, LLC TO EXCUSE TURNOVER AND RECEIVER'S COMPLIANCE WITH SECTION 543(a)-(b) OF THE BANKRUPTCY CODE

> **THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**
>
> **IF NO TIMELY RESPONSE IS FILED WITHIN 21 DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.**
>
> **A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

**TO THE HONORABLE RONALD B. KING**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

COMES NOW COMM 2015-CCRE22 EAST CENTRAL TEXAS EXPRESSWAY, LLC, a Delaware limited liability company (the "Current Lender" and together with all predecessors-in-interests, the "Lender"), and files, by and through its undersigned counsel, this *Motion of*

*COMM 2015-CCRE22 East Central Texas Expressway, LLC to Excuse Turnover and Receiver's Compliance With Section 543(a)-(b) of the Bankruptcy Code* (the "Motion").  In support of the Motion, the Lender respectfully would show the Court as follows:

## I.     PRELIMINARY STATEMENT[1]

1.      Omni Lion's Run, L.P. (the "Debtor") filed this chapter 11 proceeding as an attempt to halt the Lender's valid, non-judicial foreclosure of its lien.  After having failed to make a single debt service payment since August of 2016; *and* after having failed to provide responsive reporting of accounts as required by the terms of the Deed of Trust; *and* after having failed to cure default for over six months after notice; *and* nearly three months after a state court duly appointed a receiver to manage the Property, *now*, the Debtor—whose sole asset is subject to the Lender's security instrument—filed this chapter 11 the morning of the Lender's non-judicial foreclosure sale and astonishingly seeks turnover of the Property to the Debtor by the Receiver.  The Debtor has little hope for achieving a successful reorganization and cannot possibly contend that turnover under Bankruptcy Code section 543(b) would better serve creditors of the estate.  This tactic is an abuse of the judicial process and the reorganization provisions of the Bankruptcy Code that must not be countenanced by this Court.

2.      As set forth below, the interests of creditors would be better served if, pursuant to section 543(d)(1), the Receiver is excused from compliance from section 543(a) and (b) of title 11 of the United States Code (the "Bankruptcy Code") because: (1) the Debtor cannot demonstrate any likelihood of reorganization; (2) there is no prospective source of funding to fund reorganization; and (3) the Debtor has mismanaged the Property and should not be permitted to continue to do so during the bankruptcy proceeding.

---

[1] Capitalized terms shall have the meaning ascribed to them within the Motion and accompanying exhibits.

## II.    JURISDICTION

3.    This Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(E). Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409. The relief requested herein may be granted in accordance with the provisions of Bankruptcy Code sections 105(a), and 543(d).

## III.    BACKGROUND

4.    On May 2, 2017 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Debtor continues to operate and manage its business as a debtor in possession under Bankruptcy Code sections 1107(a) and 1108.

5.    The Debtor's primary asset is an undivided interest (the "Debtor's Interest") in a multi-family residential apartment complex, commonly known as Lion's Run Apartments (the "Property"). The Property is located at 701 E. Central Texas Expressway, Harker Heights, Bell County, Texas 76548.

### A.    Lender's Interest in the Property

6.    Prior to the Petition Date, the Debtor and the Lender were parties to various financial accommodation agreements including, *inter alia*:

    a.    *That certain **Promissory Note** dated February 18, 2015 (the "Promissory Note"), executed by Omni Lion's Run, L.P. (the "Borrower"),[2] to the order of CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., a Delaware limited partnership ("Original Lender"), in the original stated principal amount of Five Million Four Hundred Thousand and No/100 Dollars ($5,400,000.00) (the "Loan"). A true and correct copy of the Promissory Note is attached hereto as **Exhibit B**.*

    b.    *That certain **Deed of Trust**, Security Agreement, Assignment of Leases and Fixture Filing (the "Deed of Trust"), dated as of February 18, 2015, executed by Borrower for the benefit of Original Lender, and covering the*

---

[2] For consistency, this Motion refers to the Borrower uniformly as "the Debtor".

*Property, recorded on February 19, 2015, as Document Number 2015-6121, in Book 9189, Page 32, of the Official Records of Bell County, Texas; and that certain Loan Agreement (the "<u>Loan Agreement</u>"), dated as of February 18, 2015, executed by Borrower and Original Lender. A true and correct copy of the Deed of Trust is attached hereto as **<u>Exhibit C</u>**. The Note, the Deed of Trust, the Loan Agreement and all other documents and instruments[3] securing and/or evidencing the Loan, as the same may have been amended, increased, renewed, extended, spread, consolidated, severed, restated or otherwise changed from time to time, are hereinafter, collectively, referred to as the "<u>Loan Documents</u>".*

7.       The Loan documents were transferred and assigned to, and currently are held by, the Lender, who asserts that it has valid, perfected, enforceable, and non-avoidable priority liens and mortgages upon, and security interests in, the Property.

**B.       Debtor's Default Under the Loan Documents**

8.       Pursuant to the Loan Documents, the Debtor is required to deliver a monthly debt service payment on the sixth day of each month through March 6, 2025. Since executing the Loan Documents in February of 2015, the ***Debtor has made late payments, failed to pay, or been behind one or more payments since July 2015 and has not made a debt service payment at all since August 2016.***

9.       On September 14, 2016, the Lender notified the Debtor that the Debtor was in default under the terms of the Promissory Note and other Loan Documents, in that, among other things, the Debtor had failed to make the full payment of all amounts due and outstanding under the Loan Documents.

10.      On October 21, 2016, the Lender demanded immediate cure of the ongoing defaults under the Loan Documents and that unless such were fully cured on or before November

---

[3] The Original Lender and the Debtor also entered into an Assignment of Leases and Rents and Assignment of Management Agreement, true and correct copies of which are attached hereto as **<u>Exhibit D</u>** and **<u>Exhibit E</u>** respectively.

4, 2016, the Lender would accelerate the maturity of the Promissory Note and exercise its remedies under state law, including, among other things, (1) commencing non-judicial foreclosure proceedings; (2) revoking Debtor's license to collect rent to the extent provided in the Deed of Trust and applicable law, and demanding that all such sums be paid to Lender pursuant thereto; and (3) commencing an action for the immediate appointment of a receiver to, among other things, collect the rents and income from the Property.

11.     On November 4, 2016, the Lender notified the Debtor that it accelerated the maturity of the Promissory Note pursuant to the Loan Documents and declared the entire indebtedness evidenced by the Loan Documents immediately due and payable.

## C.     Appointment of a Receivership to Manage the Property

12.     On or around February 6, 2017 (the "Takeover Date") the Lender filed a Verified Original Petition and Emergency Application for Appointment of Receiver in a case styled *Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of COMM 2015-CCRE22 Mortgage Trust Commercial Mortgage Pass-Through Certificates v. Omni Lion's Run, L.P.*, Cause No. 290,525-B, in the 146th District Court of Bell County, Texas.[4] An Order Appointing Receiver was entered the same day (the "Receivership Order"). A true and correct copy of the Receivership Order is attached hereto as **Exhibit F**.

13.     Salvatore Thomas (the "Receiver") filed his Oath of Receiver on February 10, 2017 and subsequently took possession of the Property. A true and correct copy of the Receiver's Oath of Receiver is attached hereto as **Exhibit G**.

---

[4] Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of the documents filed with the Bell County District Clerk in the above-captioned case.

14.     Upon taking control of the property, the Receiver conducted a financial assessment of the rent rolls, occupancy, and rent-ready apartments.  Despite having seventy-eight (78) vacant units as of the Takeover Date, the Property had only four (4) units which were ready for occupancy.  Between the Takeover Date and April 30, 2017, the Receiver prepared an additional thirty-one (31) units for occupancy thereby increasing the number of rentable units by nearly eight-hundred percent.

15.     Since the Takeover Date, the Receiver collected rents from tenants and managed the leasing operations of the Property.  The Receiver has failed to secure approximately $7,588 of rent proceeds paid by tenants through an online portal because the Debtor has failed to turnover such proceeds despite the lawful state court Receivership Order to do so.

16.     The Receiver has made attempts to contact the Debtor's principal, Greg Hall ("Mr. Hall").  Mr. Hall has evaded the Receiver and been totally unresponsive and unreachable regarding inquires related to the Property.[5]  Mr. Hall has guaranteed the Promissory Note.

17.     Between February 2017 and April 30, 2017, the Debtor has made multiple offers (the "Offers") to the Lender to settle the Debtor's outstanding debt and each such offer has been summarily rejected.  Critically, each of the Offers required a release of Mr. Hall's guarantee.

**D.      The Bankruptcy Case**

18.     On April 6, 2017, the Lender provided formal notice to the Debtor that because of on-going, uncured defaults and because the Debtor had not paid the accelerated indebtedness

---

[5] In fact, G. Hall did not even execute the petition filed by the Debtor.  His son, Drew Hall, did.  Although D. Hall purportedly has power of attorney for G. Hall, D. Hall has been equally unhelpful with addressing various issues with management of the Property and turnover of such assets to the Receiver.

under the Promissory Note, the Lender intended to sell the Property at a non-judicial foreclosure sale on May 2, 2017.

19.    On the May 2, 2017 foreclosure sale date, moments before the Property was to be foreclosed, the Debtor filed its petition under chapter 11 of the Bankruptcy Code as a Single Asset Real Estate [Docket 1].

20.    On or about May 2, 2017, counsel for the Debtor notified the Receiver of the Debtor's intention to demand turnover of the Property under Bankruptcy Code section 543.

21.    The Lender now submits this Motion to Excuse Turnover and Receiver's Compliance with Section 543(a)-(b) of the Bankruptcy Code.

## IV.    RELIEF REQUESTED

22.    By this Motion, the Lender respectfully requests that this Court grant relief which excuses compliance with Bankruptcy Code section 543(a) and (b) pursuant to section 543(d)(1).

## V.    BASIS FOR RELIEF

23.    Generally, a receiver appointed under state law is required to deliver all property and return control to the debtor upon receiving knowledge that the debtor has commenced a bankruptcy case.  *See* 11 U.S.C. § 543(a)-(b).  Subsection (d) operates as a mechanism by which a court may excuse compliance from the requirements of section 543(a)-(b) where the **best interest of creditors** is served by the maintenance of a receiver's possession and operation of a debtor's property.  Specifically, Bankruptcy Code section 543(d)(1) provides,

> After notice and hearing, the bankruptcy court may excuse compliance with subsection (a), (b), or (c) of this section if the **interests of the creditors** . . . would be better served by permitting a custodian to continue in possession, custody, or control of such property. . .

11 U.S.C. § 543(d)(1) (emphasis added).[6]

24.     In applying this provision, courts have recognized that "[s]ection 543(d) cases are fact intensive, turning on whether the assets of the particular debtor should be administered by the existing custodian or returned to the debtor."  *In re Uno Broadcasing Corp.*, 167 B.R. 189, 200 (Bankr. D. Ariz 1994) (citing *In re Dill*, 163 B.R. 221 (E.D.N.Y. 1994)).  The party seeking relief under Bankruptcy Code section 543(d) has the burden of proof.  *In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995); *see also In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328, 332 (Bankr. S.D. Ohio 1990).

25.     In recognizing the hallmark of subsection 543(d), several courts have observed that "section 543(d) was enacted to mollify the seemingly harsh and apparently inflexible requirements of 543(b)."  *See Matter of WPAS, Inc.*, 6 B.R. 40, 43 (Bkrtcy. M.D. Fla. 1980).  In concluding that "the best interest of all must be considered, the [*WPAS*] court termed 543(d) as the codification of abstention as stated in § 305, which holds that the court may decline to entertain any controversy which otherwise would be within its judicial competence, if to do so would be in the best interest of all parties, although not necessarily in the interest of the debtor."  *In re Powers Aero Marine Servs., Inc.*, 42 B.R. 540, 544 (Bankr. S.D. Tex. 1984) (citing *Matter of WPAS, Inc.*, 6 B.R. at 43.  Commentators have further observed a key distinction between the abstention provision of Bankruptcy Code section 305 and the court's determination under section 543(d), in that "section 543(d)(1) **omits consideration of the interest of the debtor** in a bankruptcy court's determination of whether to 'abstain,' **providing greater flexibility to the**

---

[6] Bankruptcy Code section 542(d) also considers the interests of equity security holders but only if the debtor is solvent.  Such consideration is unwarranted here because the Debtor has no equity.

**court in exercising its discretion**." S*ee* 5 COLLIER ON BANKRUPTCY ¶ 543.05, Seventeenth Edition (emphasis added).

26.     In applying Bankruptcy Code section 543(d)(1), courts consider: (1) whether reorganization is likely; (2) whether there will be sufficient income to fund a successful reorganization; (3) whether there has been mismanagement by the debtor.  *See In re Powers Aero Marine Servs*., 42 B.R. 544; *In re Bryant Manor, LLC*, 422 B.R. 278, 291-92 (Bankr. D. Kan. 2010).   In weighing these factors "it is clear that Congress did not intend a brightline rule to govern these issues either way.   Even though the ordinary rule is that receivers must turn over estate property to a debtor in possession . . . the bankruptcy courts have discretion to waive that requirement if the interests of creditors would be better served by continuing the receiver in possession."  *In re Corporate & Leisure Event Prods., Inc.*, 351 B.R. 724, 732 (Bankr. D. Ariz. 2006).

### A.  There Is No Likelihood of Reorganization

27.     Reorganization is practically unimaginable in this case.   The Debtor lacks any equity in the Property, and the Lender is significantly undersecured.   To successfully reorganize, the Debtor would have to demonstrate an ability to do something which it has only three times since the inception of the Loan: make timely debt service payments.

28.     To demonstrate any reasonable prospect of reorganization, the Debtor would have to not only demonstrate that it is conceivable to reorganize, but also that any such ploy to reorganize is not merely a "scheme fraught with many contingencies. . . [or] wishful thinking, unsupported by business evidence."  *See In re Powers Aero*, 42 B.R. at 545.   In the instant case, any such speculated reorganization advanced by the Debtors will rely primarily upon the hopeful

optimism of achieving benchmarked occupancy rates which have either (i) been insufficient to maintain debt service payments or (ii) declined under the Debtor's management. Whichever the case, the likelihood of reorganization is unreasonably speculative at best, and a fabrication at worst.

29.     In fact, another court in this district already made a judicial determination that reorganization was not likely on a property (the "Adjacent Property") with comparable economics. The Adjacent Property, shares a common loan special servicer, has the same general partner, is operated by the same principal, and, until the appointment of the Receiver, shared common property management personnel. The Bankruptcy Court, in a case styled *In re Omni Lookout Ridge, L.P.*, granted the Adjacent Property lender's *Motion for Relief from the Automatic Stay* and the *Motion to Dismiss the Case. See* Cause No. 16-11048 (TMD), (Bankr. S.D. Tex.) Docket Nos. 60, 61, 79, 85. In lifting the Automatic Stay, the Bankruptcy Court found that it was unlikely that the Debtors would be able to achieve occupancy rates sufficient to effectuate a successful reorganization. The facts in *Lookout Ridge* included more nuanced cash flow scenarios whereby the Adjacent Property debtor expected increased cash flow from higher rent producing remodeled units but the Bankruptcy Court nevertheless found that reorganization was unlikely and granted the Adjacent Property lender relief from the Automatic Stay.

30.     Here, the economics are even more straightforward. The Debtor has over seventy (70) unoccupied units, and, prior to the Receiver conducting "make ready" preparations, the Debtor had only four (4) which were rentable. Given the excess inventory at the Property *and* the Adjacent Property, the analysis of the *Lookout Ridge* court demonstrates that there is no reasonable likelihood of reorganization of the Debtor in this case. Accordingly, the interests of

the Debtor's creditors will be better served if the Receiver is excused from turnover and compliance with Bankruptcy Code section 543(a) and (b).

**B.     The Debtors Have Insufficient Income To Fund a Successful Reorganization**

31.     Nearly all evidence indicates that the Debtor has insufficient funds and resources to maintain and manage the Property, which includes multi-family residential dwellings. Perhaps the best indication that the Debtors lack sufficient funds to operate the Property—other than the failure to timely deliver debt service payments—is the condition of the Property when the Receiver took possession on the Takeover Date.   As discussed above, the Receiver took control of the Property and approximately 40% of the units were vacant.   Although vacancy, alone, may say little regarding the Debtor's inability to fund adequate management of the Property, the fact that ***only four of the over seventy vacant units had undergone "make ready" preparations for occupancy*** surely indicates the Debtors have insufficient funding to maintain the Property.   In other words, the Debtor had failed to properly "make ready" over seventy of the apartments—a process that is a ***prerequisite to any possible reorganization***.

32.     The insufficient available cash not only undermines any hope for a successful reorganization, but also demonstrates the Debtor's inability to fund the reorganization process itself.   Furthermore, as a Single Asset Real Estate ("SARE") [see Docket No. 1], there is no prospect for securing debtor in possession financing.   With nearly $7 million in secured debt outstanding as of the Petition Date, it seems improbable, if not impossible, that the Debtor will obtain postpetition financing.   Finally, as a SARE, the Debtors *must* commence interest payments within 90 days of the Petition Date.   *See* 11 U.S.C. § 362(d)(3).   Such interest-only

payments will account for most, if not all of the Debtor's monthly rent revenues. Therefore, there is insufficient income to fund a reorganization process.

**C.    The Property Has Been Horribly Mismanaged**

33.    Courts regularly inquire into the Debtor's prepetition management of the subject property in determining whether the Property has been mismanaged. Indeed, a motion under Bankruptcy Code section 543(d) necessarily follows shortly after the petition date. Furthermore, some courts have even held that if a receiver turns over the property *before* bringing a motion under 543(d)(1), a bankruptcy court cannot re-vest the receiver, and therefore, the *only* inquiry with respect to mismanagement is the Debtor's prepetition conduct with respect to the Property. *See* 5 Collier on Bankruptcy ¶ 543.05; see also *In re Watkins*, 63 B.R. 46, 47-48 (Bankr. D. Colo. 1986). Several factors demonstrate that the Debtor horribly mismanaged the Property prior to the Turnover Date.

34.    ***First***, The Debtor has failed to make a debt service payments since August 8, 2016; failed to "make ready" units for potential new leases; and failed to cultivate rental revenues sufficient to generate positive cash flows. *See e.g.*, *In re Powers Aero*, 42 B.R. at 545 (holding that the debtors failure to operate a successful business demonstrated mismanagement of the custodial property); *see also See In re Bryant Manor*, 422 B.R at 291 (holding that the custodial property was mismanaged where, among other things, (a) "there were ten to twelve vacant units that needed repairs before they could be rented," (b) the Debtor failed to adequately vet tenants, and (c) the Debtor has failed to maintain an account containing the security deposits paid by renters).

35.	***Second***, upon information and belief the Debtor used the Lender's funds in violation of the Loan Documents.  The Assignment of Rents and Leases assigns all leases and rents to the Lender and licenses the leases and rents back to the Debtor.  Debtor's revocable license to collect and receive rents was for the purpose of holding such funds to discharge all current payments due under the Loan Documents.  Upon information and belief the Debtor has collected rent from tenants of the Property pursuant to its license to do so under the Assignment of Rents from August of 2016 to the Takeover Date.  Despite collecting such rents from tenants each month, the Debtor has (i) failed to make timely debt service payments required under the Promissory Note; (ii) failed to make timely deposit into the tax reserve account as required under the Loan Documents; and (iii) failed to make timely deposit into the insurance reserve account as required under the Loan Documents.

36.	***Third***, despite collecting such rents, and despite failing to pay debt service and reserve payments, upon information and belief, the Lender expects that (once filed) the Debtor's schedules of assets and liabilities will inexplicably report insignificant cash on hand as of the Petition Date—except, of course, for the cash collected by the Receiver since the Takeover Date.  Further, upon information and belief, the Debtor has (i) comingled funds with a commonly-owned adjacent residential apartment complex and (ii) comingled funds with the Borrower's principal, Gregory Hall.  Such expenditures and such comingling of funds violated the Debtor's obligation under the Loan Documents and demonstrate mismanagement of the Property.  *See In re Bryant Manor*, 422 B.R. at 290 (granting a motion under section 543(d) where "Debtors had not made any payment on the mortgage debt for at least a five month period (which would total $100,000 'saved'), yet still managed" to run short on cash to pay its bills).

37.	*Fourth*, as of the Petition Date, in violation of the state court Receivership Order, the Debtor has failed to deliver cash held in the Debtor's bank accounts, failed to turnover tenant security deposits, and failed to turnover other property to which turnover applies under applicable state law.  Furthermore, the Debtor has been totally unresponsive and uncooperative with the Receiver's request for such turnover.  Ironically, the Debtor has the legal acumen to immediately demand turnover from the Receiver upon the filing of this bankruptcy proceeding, but lacks to wherewithal perform nearly the exact same duty under applicable state law prior to the Petition Date.  Such demonstrates not only that the Debtor was acutely aware of the Receivership appointment, but also the Debtor's willingness to flaunt its noncompliance with the Receivership Order.

38.	*Fifth*, turnover under 543(b), in and of itself, is a waste of estate resources and further erodes creditor recovery in this bankruptcy case.  Given the unlikely prospects for reorganization and the significant likelihood that this case will be dismissed or that the Lender will receive relief from the automatic stay to foreclose, the wasteful transition from operation by the Receiver to operation by the Debtor—only to revert to the Receiver upon dismissal or life-stay—is burdensome to the Debtor's estate and harmful to the estate's creditors.

39.	These factors strongly support excusing turnover and Receiver's compliance with 543(a) and (b).

**D.	Excusing Compliance with § 543(a) and (b) Better Serves the Interest of the Creditors**

40.	Where, as here, the Debtor is insolvent, "the Court's inquiry is limited to the interest of creditors."  *In re Northgate Terrace Apartments, Ltd.*, 117 B.R. 328, 332 (Bankr. S.D. Ohio 1990).  If turnover "would only serve to benefit the interests of the sole equity security

holder to the detriment of all creditors . . . [r]equiring turnover would reasonably be foreseen to be injurious to the interests of the creditors[, and the] interests of the creditors of the estate can only be served by having the custodian excused from strict compliance with the turnover provision of § 543." *See In re Powers Aero* 42 B.R. 546 (S.D. Tex 1984).

41.     In addition to the analysis above, the interests of the creditors would be better served in the instant case because the Lender seeks to enlist the Receiver to manage the Adjacent Property and because the interests of creditors would be better served through joint management of the Property and Adjacent Property. The Adjacent Property is (i) contiguous with the Property; (ii) owned by a limited partnership which shares a common general partner (Omni G.P.) with the Debtor; (iii) burdened by a loan serviced by a common special servicer (LNR Partners); and (iv) has common maintenance contracts—all of which underscore synergies that would be captured for the benefit of creditors if the Court grants this Motion.

42.     No creditor will be harmed by excusing the Receiver from compliance with Bankruptcy Code section 543(a) and (b). Indeed, the above analysis makes clear that the Debtor's estate has benefited from the Receiver's diligent operation of the Property. And so have the Creditors. Although the Debtor seeks turnover presumably to command its own chapter 11 proceeding, such *debtor* interests are beyond the inquiry made by courts in considering the relief requested by this Motion. The interests of the creditors are better served by the Receiver's possession and operation of the Property, and, accordingly, this Court should excuse the Receiver from compliance with Bankruptcy Code section 543(a) and (b).

## VI.     NO PRIOR REQUEST

43.     No previous request for the relief sought in this Motion has been made to this or any other court.

# VII.    CONCLUSION

In light of the foregoing, the Lender respectfully requests that the Court (i) enter an order, substantially in the form annexed hereto as **Exhibit A**, excusing turnover and the Receiver's compliance with Bankruptcy Code section 543(a) and (b) and (ii) granting the Lender such other and further relief to which it shows itself to be justly entitled.

Respectfully submitted this 9th day of May, 2017.

AKIN GUMP STRAUSS HAUER & FELD LLP

By:  */s/ Charles R. Gibbs*
       Charles R. Gibbs
       (Texas State Bar No. 07846300)
       Eric T. Haitz
       (*Pro Hac Vice* Application Pending)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*ATTORNEYS FOR COMM 2015-CCRE22 EAST CENTRAL TEXAS EXPRESSWAY, LLC*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 9, 2017, a true and correct copy of the *Motion of COMM 2015-CCRE22 East Central Texas Expressway, LLC to Excuse Turnover and Receiver's Compliance With Section 543(a)-(b) of the Bankruptcy Code* was served via e-mail to the parties listed below.

**DEBTOR'S ATTORNEY**:
Ron Satija
Hajjar Peters LLP
3144 Bee Caves Rd
Austin, TX 78746
512.637.4956
Fax : 512.637.4958
Email: rsatija@legalstrategy.com

*/s/ Charles R. Gibbs*
Charles R. Gibbs

**<u>EXHIBIT A</u>**


**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OMNI LION'S RUN APARTMENTS, L.P. | ) | Case No. 17-60329 (RBK) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**ORDER GRANTING MOTION TO EXCUSE
TURNOVER AND RECEIVER'S COMPLIANCE WITH SECTION 543(a)-(b)**

The Bankruptcy Court, having considered (i) the *Motion of COMM 2015-CCRE22 East Central Texas Expressway, LLC to Excuse Turnover and Receiver's Compliance With Section 543(a)-(b) of the Bankruptcy Code* (the "Motion") filed by COMM 2015-CCRE22 East Central Texas Expressway, LLC; and having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual grounds set forth in the

1

Motion establish just cause for the relief granted herein; and any objections to the relief sought herein having been overruled; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, the Court finds that the Motion should be granted. Unless otherwise stated herein, all capitalized terms shall have the meaning ascribed to them in the Motion.

**IT IS THEREFORE ORDERED** that:

1. The Motion is GRANTED in its entirety, and the Receiver is excused from turnover of the Property described in the Motion and is excused from compliance with Bankruptcy Code sections 543(a) and (b).

2. The Receiver is hereby authorized to continue to serve as receiver for the Property and to take all actions authorized by the District Court of Bell County, Texas, pursuant to the Order Appointing Receiver, in the matter styled *Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of COMM 2015-CCRE22 Mortgage Trust Commercial Mortgage Pass-Through Certificates v. Omni Lion's Run, L.P.*, Cause No. 290,525-B, in the 146th District Court of Bell County, Texas.

3. Neither the filing of the Motion nor the entry of this Order shall constitute a waiver of any rights or a consent to any relief requested in these jointly administered Chapter 11 cases, and the Lender, the Receiver, and the Debtors reserve all rights claims and defenses available to each of them in, and with respect to, the Debtors' chapter 11 cases.

4. This Court shall have jurisdiction over any and all disputes arising under this Order.

# # #

ORDER SUBMITTED BY:

Charles R. Gibbs (SBN: 07846300)
Eric T. Haitz (*pro hac vice* application pending)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone:  (214) 969-2800
Facsimile:  (214) 969-4343

*Counsel for COMM 2015-CCRE22*
*East Central Texas Expressway, LLC*

**Promissory Note**

# PROMISSORY NOTE

$5,400,000

New York, New York
February 18, 2015

FOR VALUE RECEIVED OMNI LION'S RUN, L.P., a Texas limited partnership, as maker, having its principal place of business at 1102 North Austin Avenue, Georgetown, Texas 78626 (together with its permitted successors and assigns, collectively, "***Borrower***"), hereby unconditionally promises to pay to the order of CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., a Delaware limited partnership, as lender, having an address at 110 East 59th Street, New York, New York 10022 (together with its successors and assigns, collectively, "***Lender***"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of Five Million Four Hundred Thousand and No/100 Dollars ($5,400,000.00), or so much thereof as is advanced pursuant to that certain Loan Agreement, dated the date hereof, between Borrower and Lender (as the same may be amended, modified, restated, replaced, supplemented or otherwise modified from time to time, the "***Loan Agreement***"), in lawful money of the United States of America, with interest thereon to be computed from the date of this Promissory Note (as the same may be amended, supplemented, restated, replaced or otherwise modified from time to time, this "***Note***") at the Interest Rate (as defined in the Loan Agreement), and to be paid in accordance with the terms of this Note and the Loan Agreement. All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.

## ARTICLE 1: PAYMENT TERMS

Borrower agrees to pay the principal sum of this Note and interest on the unpaid principal sum of this Note and all other amounts due under the Loan Agreement and other Loan Documents from time to time outstanding without relief from valuation and appraisement laws at the rates and at the times specified in the Loan Agreement and the outstanding balance of the principal sum of this Note and all accrued and unpaid interest thereon and all other amounts due under the Loan Agreement and other Loan Documents shall be due and payable, in all events, on the Maturity Date.

## ARTICLE 2: DEFAULT AND ACCELERATION

The Debt shall without notice become immediately due and payable at the option of Lender, if any payment required in this Note is not paid (a) on or prior to the date when due, (b) on the Maturity Date or (c) on the happening of any other Event of Default.

## ARTICLE 3: LOAN DOCUMENTS

This Note is secured by the Security Instrument and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument and the other Loan Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. In the event of a conflict or inconsistency between the terms of this Note and the Loan Agreement, the terms and provisions of the Loan Agreement shall govern.

## ARTICLE 4: SAVINGS CLAUSE

Notwithstanding anything to the contrary contained herein, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over

1

the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender.

## ARTICLE 5: NO ORAL CHANGE

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6: WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby jointly and severally waive presentment and demand for payment, notice of dishonor, notice of intention to accelerate, notice of acceleration, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment, of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the individuals or entities comprising the partnership or limited liability company, and the term "Borrower," as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained herein shall remain in full force and be applicable notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "Borrower" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. Nothing in the foregoing two sentences shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation, as applicable, which may be set forth in the Loan Agreement, the Security Instrument or any other Loan Document.

## ARTICLE 7: TRANSFER

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under Legal Requirements given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8: EXCULPATION

The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Note to the same extent and with the same force as if fully set forth herein.

## ARTICLE 9: GOVERNING LAW

This Note shall be governed in accordance with the terms and provisions of <u>Section 10.3</u> of the Loan Agreement.

## ARTICLE 10: NOTICES

All notices or other written communications hereunder shall be delivered in accordance with <u>Section 10.6</u> of the Loan Agreement.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

4816-8170-4993, v. 4

IN WITNESS WHEREOF, Borrower has duly executed this Promissory Note as of the day and year first above written.

**BORROWER**:

OMNI LION'S RUN, L.P., a Texas limited partnership

By: Omni Lion Management, Inc., a Texas
    corporation, its general partner

    By: _____
    Name: Gregory G. Hall
    Title: Director

## EXHIBIT C

**Deed of Trust**

1405l448

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

---

**DEED OF TRUST, SECURITY AGREEMENT,
ASSIGNMENT OF LEASES AND FIXTURE FILING**

---

OMNI LION'S RUN, L.P., as grantor
(Borrower)

to

David Darnell, as trustee
(Trustee)

for the benefit of

CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., as beneficiary
(Lender)

| | |
|---|---|
| Dated: | As of February 18, 2015 |
| Location: | 701 East Central Texas Expressway<br>Harker Heights, Texas 76548 |
| County: | Bell County, Texas |

**ATTENTION COUNTY RECORDER: THIS INSTRUMENT IS INTENDED TO BE EFFECTIVE AS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO SECTION 9.502(c) OF THE TEXAS BUSINESS AND COMMERCE CODE. PORTIONS OF THE GOODS COMPRISING A PART OF THE MORTGAGED PROPERTY ARE OR ARE TO BECOME FIXTURES RELATED TO THE LAND DESCRIBED IN EXHIBIT "A" HERETO. THIS INSTRUMENT IS TO BE FILED FOR RECORD IN THE RECORDS OF BELL COUNTY, TEXAS AND SHOULD BE INDEXED AS BOTH A DEED OF TRUST AND AS A FINANCING STATEMENT COVERING FIXTURES. THE ADDRESSES OF TRUSTOR (DEBTOR) AND LENDER (SECURED PARTY) ARE SPECIFIED WITHIN THIS INSTRUMENT.**

PREPARED BY AND UPON
RECORDATION RETURN TO:
Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, New York 10022
Attention: Zachary Samton, Esq. & File Manager
File No.: 3302.0043

## DEED OF TRUST, SECURITY AGREEMENT,
## ASSIGNMENT OF LEASES AND FIXTURE FILING

This **DEED OF TRUST, SECURITY AGREEMENT, ASSIGNMENT OF LEASES AND FIXTURE FILING** (as the same may be amended, restated, replaced, supplemented or otherwise modified, being hereinafter referred to as this *"Security Instrument"*), is made as of February 18, 2015, by OMNI LION'S RUN, L.P., a Texas limited partnership, having its principal place of business at 1102 North Austin Avenue, Georgetown, Texas 78626, as grantor (*"Borrower"*) to David Darnell having an address at c/o Longhorn Title Co., Inc., 801 Main Street, Georgetown, Texas 78626, the trustee hereunder (*"Trustee"*) for the benefit of CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., a Delaware limited partnership, having an address at 110 East 59th Street, 6th Floor, New York, New York 10022, as beneficiary (together with its successors and assigns, collectively, *"Lender"*).

## W I T N E S S E T H:

WHEREAS, this Security Instrument is given to secure a loan (the *"Loan"*) in the principal sum of Five Million Four Hundred Thousand and No/100 Dollars ($5,400,000.00) advanced pursuant to that certain Loan Agreement, dated as of the date hereof, between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the *"Loan Agreement"*), and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower in favor of Lender (as the same may be amended, restated, replaced, supplemented, extended or otherwise modified from time to time, the *"Note"*). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Loan Agreement;

WHEREAS, Borrower desires to secure the payment of the Debt (as defined in the Loan Agreement) and the performance of the Other Obligations (hereinafter defined); and

WHEREAS, this Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement, the Note, and that certain Assignment of Leases and Rents, dated as of the date hereof, made by Borrower in favor of Lender delivered in connection with this Security Instrument (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the *"Assignment of Leases"*), including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument, the Assignment of Leases and all other documents evidencing or securing or otherwise setting out conditions, covenants, representations and/or remedies in favor of the Lender in connection with the funding of the Debt (including all additional mortgages, deeds of trust, deeds to secure debt and assignments of leases and rents) or executed or delivered in connection therewith, are hereinafter referred to collectively as the *"Loan Documents"*).

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument:

## ARTICLE 1 - GRANTS OF SECURITY

**Section 1.1** **Property Mortgaged**. Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to Trustee **IN TRUST, WITH POWER OF SALE AND RIGHT OF ENTRY AND POSSESSION** for the benefit and security of Lender and does

1

hereby grant a security interest in and assigns to Lender all of the real, personal, tangible and intangible property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "***Property***"), including, without limitation, the following:

(a)     Land. The real property, and/or leasehold interest in the real property, described in **Exhibit "A"** attached hereto and made a part hereof (the "***Land***");

(b)     Additional Land. All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument;

(c)     Improvements.     The buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land (collectively, the "***Improvements***");

(d)     Easements. All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, permits, licenses, rights of way and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, relating or pertaining to the Land and the Improvements and the reversions and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(e)     Equipment. All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, heating, ventilation or air conditioning equipment, garbage equipment and apparatus, incinerators, boilers, furnaces, motors, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "***Equipment***"). Notwithstanding the foregoing, Equipment shall not include any property belonging to tenants under leases except to the extent that Borrower shall have any right or interest therein;

(f)     Fixtures. All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in connection with (temporarily or permanently) any of the Improvements or the Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned

2

individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "*Fixtures*"). Notwithstanding the foregoing, "Fixtures" shall not include any property which tenants are entitled to remove pursuant to leases except to the extent that Borrower shall have any right or interest therein;

(g)     Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Uniform Commercial Code, whether tangible or intangible, other than Fixtures, which are now or hereafter owned by Borrower, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "*Personal Property*"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state or states where any of the Property is located (as amended from time to time, the "*Uniform Commercial Code*"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(h)     Leases and Rents. All leases (including, without limitation, ground leases, subleases or subsubleases), lettings, licenses, concessions or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into (collectively, the "*Leases*"), whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "*Bankruptcy Code*") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, deposits (including, without limitation, security, utility and other deposits) accounts and receipts from the Land and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code (collectively, the "*Rents*") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt and the performance of the Other Obligations;

(i)     Condemnation Awards. All Awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to all or any portion of the Property, whether from the exercise of the right of eminent domain (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Property including, without limitation, any award or awards, or settlements or payments, hereafter made resulting from (i) condemnation proceedings or the taking of all or any portion of the Improvements, the Equipment, the Fixtures, the Leases or the Personal Property, or any part thereof, under the power of eminent domain; or (ii) the alteration of grade or the location or the discontinuance of any street adjoining the Property or any portion thereof; and Borrower hereby agrees to execute and deliver from time to time such further instruments as may be requested by Trustee or Lender to confirm such assignment to Lender of any such award, damage, payment or other compensation;

3

(j)     Insurance Proceeds. All Insurance Proceeds in respect of the Property under any Policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any Policies, judgments, or settlements made in lieu thereof, in connection with a Casualty to the Property;

(k)     Tax Certiorari. All refunds, rebates or credits in connection with any reduction in Taxes or Other Charges charged against the Property;

(l)     Conversion. All proceeds of the conversion, voluntary or involuntary, of any of the foregoing including, without limitation, Insurance Proceeds and Awards, into cash or liquidation claims;

(m)     Rights. The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(n)     Agreements. All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the happening of any default hereunder, to receive and collect any sums payable to Borrower thereunder;

(o)     Trademarks. All trade names, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(p)     Accounts. All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, including, without limitation, all accounts established or maintained pursuant to the Loan Agreement, the Clearing Account Agreement or the Cash Management Agreement; together with all deposits or wire transfers made to such accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof; and

(q)     Other Rights. Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (p) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Borrower expressly grants to Lender, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Improvements and the Fixtures collectively referred to as the "*Real Property*") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

**Section 1.2     Assignment of Rents.** Borrower hereby absolutely and unconditionally assigns to Trustee in trust for Lender all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Nevertheless, subject to the terms of the

4

Assignment of Leases, the Loan Agreement, the Clearing Account Agreement, the Cash Management Agreement and Section 7.1(h) of this Security Instrument, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents and Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

**Section 1.3** **Security Agreement**. This Security Instrument is both a real property mortgage or deed of trust and a "security agreement" within the meaning of the Uniform Commercial Code. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property including all accounts established by Lender pursuant to the Loan Agreement or the Cash Management Agreement. By executing and delivering this Security Instrument, Borrower hereby grants to Lender and Trustee, as security for the Obligations (hereinafter defined), a security interest in the Fixtures, the Equipment, the Personal Property and the other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "***Collateral***"). If an Event of Default shall occur and be continuing, Lender or Trustee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender or Trustee after the occurrence and during the continuance of an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender or Trustee at a convenient place (at the Land if tangible property) reasonably acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including reasonable legal expenses and attorneys' fees and costs, incurred or paid by Lender or Trustee in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default. Any notice of sale, disposition or other intended action by Lender or Trustee with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) Business Days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper. Borrower's (debtor's) principal place of business is as set forth on the first page hereof and the address of Lender (secured party) is as set forth on the first page hereof.

**Section 1.4** **Fixture Filing**. Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, and this Security Instrument, upon being filed for record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement (naming Borrower as the Debtor and Lender as the Secured Party) filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.

**Section 1.5** **Pledges of Monies Held**. Borrower hereby pledges to Lender and grants to Lender a security interest in any and all monies now or hereafter held by Lender or on behalf of Lender in connection with the Loan, including, without limitation, any sums deposited in the Clearing Account, the Cash Management Account, the Reserve Funds and Net Proceeds, as additional security for the Obligations until expended or applied as provided in this Security Instrument.

5

## CONDITIONS TO GRANT

**TO HAVE AND TO HOLD** the above granted and described Property unto Trustee, and its successor and assigns, **IN TRUST WITH POWER OF SALE,** for the benefit of Lender and its successors and assigns, forever, to secure the Borrower's payment to Lender of the Debt and performance of the Other Obligations at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument;

**PROVIDED, HOWEVER,** these presents are upon the express condition that, if Borrower shall well and truly (a) pay to Lender the Debt at the time and in the manner provided in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, (b) perform the Other Obligations as set forth in the Loan Agreement, this Security Instrument and the other Loan Documents, and (c) abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; *provided, however*, that Borrower's obligation to indemnify and hold harmless Lender and Trustee pursuant to the provisions hereof shall survive any such payment or release.

## ARTICLE 2 - DEBT AND OBLIGATIONS SECURED

**Section 2.1     Debt**.  This Security Instrument and the grants, assignments and transfers made in Article 1 hereof are given for the purpose of securing the Debt.

**Section 2.2     Other Obligations**.  This Security Instrument and the grants, assignments and transfers made in Article 1 hereof are also given for the purpose of securing the following (the "*Other Obligations*"):

        (a)     the performance of all other obligations of Borrower contained herein;

        (b)     the performance of each obligation of Borrower contained in the Note, the Loan Agreement and any other Loan Document; and

        (c)     the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

**Section 2.3     Debt and Other Obligations**.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "*Obligations.*"

## ARTICLE 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

**Section 3.1     Payment of Debt**.  Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

**Section 3.2     Incorporation by Reference**.  All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are

6

hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

**Section 3.3**    **Insurance**. Borrower shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

**Section 3.4**    **Maintenance of Property**. Borrower shall cause the Property to be maintained in a good and safe condition and repair. The Improvements, the Fixtures, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Improvements) without the consent of Lender or as otherwise permitted pursuant to the Loan Agreement. Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Land.

**Section 3.5**    **Waste**. Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Property or the security of this Security Instrument. Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

**Section 3.6**    **Payment for Labor and Materials**.    (a)    Subject to Section 3.6(b) hereof, Borrower (i) will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("***Labor and Material Costs***") incurred in connection with the Property, (ii) never permit to exist beyond the due date thereof in respect of the Property or any part thereof any Lien or security interest, even though inferior to the Liens and security interests created hereby and by the other Loan Documents, and (iii) never permit to be created or exist in respect of the Property or any part thereof any other or additional Lien or security interest other than the Liens or security interests created hereby and by the other Loan Documents except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, provided that (i) no Event of Default has occurred and is continuing under the Loan Agreement, the Note, this Security Instrument or any of the other Loan Documents, (ii) Borrower is permitted to do so under the provisions of any other mortgage, deed of trust or deed to secure debt affecting the Property, (iii) such proceeding shall suspend the collection of the Labor and Material Costs from Borrower and from the Property or Borrower shall have paid all of the Labor and Material Costs under protest, (iv) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (v) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, canceled or lost, and (vi) Borrower shall have furnished the security as may be required in the proceeding, or as may be reasonably requested by Lender, to insure the payment of any contested Labor and Material Costs, together with all interest and penalties thereon.

**Section 3.7**    **Performance of Other Agreements**. Borrower shall observe and perform each and every term, covenant and provision to be observed or performed by Borrower pursuant to the Loan

7

Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

**Section 3.8** **Change of Name, Identity or Structure**. Borrower shall not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership or other structure without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender. Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interests granted herein. At the request of Lender from time to time, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower is operating or intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

## ARTICLE 4 - OBLIGATIONS AND RELIANCES

**Section 4.1** **Relationship of Borrower and Lender**. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of the Loan Agreement, the Note, this Security Instrument or any other Loan Document shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

**Section 4.2** **No Reliance on Lender**. The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower, as applicable, are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

**Section 4.3** **No Lender Obligations** (a) Notwithstanding the provisions of Subsections 1.1(h) and (n) or Section 1.2 hereof, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to any other agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses or other documents.

(b) By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any Officer's Certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or Policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

**Section 4.4** **Reliance**. Borrower recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Section 4.1 of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Section 4.1 of the Loan Agreement.

8

## ARTICLE 5 - FURTHER ASSURANCES

**Section 5.1**     <u>Recording of Security Instrument, etc</u>.  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a Lien or security interest or evidencing the Lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and to fully protect and perfect the Lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any other security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any other security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

**Section 5.2**     <u>Further Acts, etc.</u>  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender and Trustee to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements to evidence more effectively the security interest of Lender in the Property.  Borrower grants to Lender and Trustee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this <u>Section 5.2</u>.

**Section 5.3**     <u>Changes in Tax, Debt, Credit and Documentary Stamp Laws</u>.

(a)     If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender, unenforceable or provide the basis for a defense of usury, then Lender shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

9

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents, or shall impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

**Section 5.4    Severing of Security Instrument.**  This Security Instrument and the Note may, at any time until the same shall be fully paid and satisfied, at the sole election of Lender, be severed into two or more notes and two or more security instruments in such denominations as Lender shall determine in its sole discretion, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Lender.

**Section 5.5    Replacement Documents**.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or a replacement of such other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

## ARTICLE 6 - DUE ON SALE/ENCUMBRANCE

**Section 6.1    Lender Reliance**.  Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for the repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

**Section 6.2    No Sale/Transfer**.  Neither Borrower nor any Restricted Party shall Transfer the Property or any part thereof or any interest therein or permit or suffer the Property or any part thereof or any interest therein to be Transferred other than as expressly permitted pursuant to the terms of the Loan Agreement.

## ARTICLE 7 - RIGHTS AND REMEDIES UPON DEFAULT

**Section 7.1    Remedies**.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender or Trustee may take such action, without notice or demand to the fullest extent permitted by law, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)    declare the entire unpaid Debt to be immediately due and payable;

10

(b)     institute proceedings, judicial or otherwise, for the complete foreclosure, in accordance with Texas law, of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)     with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing Lien and security interest of this Security Instrument for the balance of the Debt and the Other Obligations not then due, unimpaired and without loss of priority;

(d)     sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law; and without limiting the foregoing:

(i)     in connection with any sale or sales hereunder, Lender shall be entitled to elect to treat any of the Property which consists of (x) a right in action, or (y) property that can be severed from the Real Property covered hereby, or (z) any improvements (without causing structural damage thereto), as if the same were personal property, and dispose of the same in accordance with applicable law, separate and apart from the sale of the Real Property. Where the Property consists of Real Property, Personal Property, Equipment or Fixtures, whether or not such Personal Property or Equipment is located on or within the Real Property, Lender shall be entitled to elect to exercise its rights and remedies against any or all of the Real Property, Personal Property, Equipment and Fixtures in such order and manner as is now or hereafter permitted by applicable law;

(ii)     Lender shall be entitled to elect to proceed against any or all of the Real Property, Personal Property, Equipment and Fixtures in any manner permitted under applicable law; and if Lender so elects pursuant to applicable law, the power of sale herein granted shall be exercisable with respect to all or any of the Real Property, Personal Property, Equipment and Fixtures covered hereby, as designated by Lender;

(iii)     should Lender elect to sell any portion of the Property which is Real Property or which is Personal Property, Equipment or Fixtures that the Lender has elected under applicable law to sell together with Real Property in accordance with the laws governing a sale of the Real Property, Lender shall give such notice of the occurrence of an Event of Default, if any, and its election to sell such Property as may then be required by law. Thereafter, upon the giving of such notice of sale and the expiration of any required time period as may then be required by law, subject to the terms hereof and of the other Loan Documents, and without the necessity of any demand on Borrower or Lender at the time and place specified in the notice of sale, shall sell such Real Property or part thereof at public auction to the highest bidder for cash in lawful money of the United States. Lender may from time to time postpone any sale hereunder by public announcement thereof at the time and place noticed for any such sale; and

(iv)     if the Property consists of several lots, parcels or items of property, Lender shall, subject to applicable law, (A) designate the order in which such lots, parcels or items shall be offered for sale or sold, or (B) elect to sell such lots, parcels or items through a single sale, or through two or more successive sales, or in any other manner

11

Lender designates in Lender's sole discretion. Any Person, including Borrower or Lender, may purchase at any sale hereunder. Should Lender desire that more than one sale or other disposition of the Property be conducted, Lender shall, subject to applicable law, cause such sales or dispositions to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Lender may designate, and no such sale shall terminate or otherwise affect the lien of this Security Instrument on any part of the Property not sold until all the Obligations have been satisfied in full. In the event Lender elects to dispose of the Property through more than one sale, except as otherwise provided by applicable law, Borrower agrees to pay the costs and expenses of each such sale and of any judicial proceedings wherein such sale may be made;

(e)       institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, in the Loan Agreement or in the other Loan Documents or cause the Trustee to sell the Property in accordance with the provisions of Section 15.3 hereof;

(f)       recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)       apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or indemnitor with respect to the Loan or any Person otherwise liable for the payment of the Debt or any part thereof;

(h)       the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt and the performance of the Other Obligations, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees and costs) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, Insurance Premiums and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)       exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the

12

right to take possession of the Fixtures, the Equipment and/or the Personal Property or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment and/or the Personal Property, and (ii) request Borrower at its expense to assemble the Fixtures, the Equipment and/or the Personal Property and make it available to Lender or Trustee at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender or Trustee with respect to the Fixtures, the Equipment and/or the Personal Property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j) apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its sole discretion:

(i) Taxes and Other Charges;

(ii) Insurance Premiums;

(iii) Interest on the unpaid principal balance of the Note;

(iv) Amortization of the unpaid principal balance of the Note; or

(v) All other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation, the Yield Maintenance Fee, if applicable, and advances made by Lender pursuant to the terms of this Security Instrument;

(k) pursue such other remedies as Lender may have under applicable law; or

(l) apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its sole and absolute discretion.

In the event of a sale, by foreclosure, power of sale or otherwise, of less than all of the Property, this Security Instrument shall continue as a Lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

**Section 7.2     Application of Proceeds**.  The purchase money, proceeds and avails of any disposition of the Property, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

**Section 7.3     Right to Cure Defaults**.  Upon the occurrence and during the continuance of any Default or Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any Other Obligations hereunder, make any payment or do any act required of Borrower hereunder or in the other Loan Documents with respect to any Other Obligations which payment or action on the part of Lender shall be in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or to collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and expenses to the extent permitted by law), with interest as provided in this Section 7.3, shall constitute a portion of the Debt and shall be due and payable

13

to Lender upon demand. All such costs and expenses incurred by Lender in remedying any Default or Event of Default or in appearing in, defending, or bringing any such action or proceeding, as hereinabove provided, shall bear interest at the Default Rate, for the period beginning on the first day after notice from Lender that such cost or expense was incurred and continuing until the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and to be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

**Section 7.4** **Actions and Proceedings**. Lender and Trustee, or either of them, has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its sole and absolute discretion, decides should be brought to protect its interest in the Property.

**Section 7.5** **Recovery of Sums Required To Be Paid**. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for any Default or Event of Default by Borrower existing at the time such earlier action was commenced.

**Section 7.6** **Examination of Books and Records**. At reasonable times and upon prior reasonable notice (which may be given verbally), Lender, its agents, accountants and attorneys shall have the right to examine the records, books and management and other papers of Borrower which reflect upon its financial condition, at the Property or at any office regularly maintained by Borrower where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, at reasonable times and upon reasonable notice (which may be given verbally), Lender, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Borrower pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Borrower where the books and records are located. This Section 7.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing.

**Section 7.7** **Other Rights, etc.** (a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Obligations or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b) It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for any decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c) Lender may resort for the payment of the Debt and the performance of the Other Obligations to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce the Other Obligations or any covenant hereof without prejudice to the right of Lender thereafter to foreclose this

14

Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

**Section 7.8** **Right to Release Any Portion of the Property**. Lender, or Trustee upon written instructions from Lender, may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the Lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the Debt shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and Lender may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a Lien and security interest in the remaining portion of the Property.

**Section 7.9** **Violation of Laws**. If the Property is not in full compliance with any Legal Requirement, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

**Section 7.10** **Recourse and Choice of Remedies**. Notwithstanding any other provision of this Security Instrument or the Loan Agreement, including, without limitation, Section 3.1 of the Loan Agreement, Lender and other Indemnified Parties are entitled to enforce the obligations of Borrower and any guarantor or indemnitor with respect to the Loan contained in Section 8.1 herein without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower and any guarantor or indemnitor with respect to the Loan. The provisions of Section 8.1 hereof are exceptions to any non-recourse or exculpation provisions in the Loan Agreement, the Note, this Security Instrument or the other Loan Documents, and Borrower and any guarantor or indemnitor with respect to the Loan are fully and personally liable for the obligations set forth in said Section 8.1 hereof. The liability of Borrower and any guarantor or indemnitor with respect to the Loan pursuant to Section 8.1 hereof is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing or exercising any other rights and remedies pursuant to the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Borrower pursuant to Section 8.1 hereof whether or not an action is brought against any other Person and whether or not any other Person is joined in the action or actions. In addition, Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in Article 7 or Article 8 herein.

**Section 7.11** **Right of Entry**. Upon reasonable notice to Borrower (which may be given verbally), Lender and its agents (including Trustee) shall have the right to enter and inspect the Property at all reasonable times.

**Section 7.12** **Lender Not Obligated; Cumulative Rights**. Nothing in this instrument shall be construed as obligating Lender to take any action or incur any liability with respect to the Property, and all options given to Lender are for its benefit and shall and may be exercised in such order and in such combination as Lender in its sole discretion may from time to time decide. Each remedy is distinct and

15

cumulative to all other rights and remedies under this Instrument and the Loan Documents or afforded by law or equity, and may be exercised concurrently, independently or successively, in any order whatsoever.

## ARTICLE 8 – MORTGAGE TAX INDEMNIFICATION

**Section 8.1** <u>Mortgage and/or Intangible Tax</u>. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon, incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument, the Note or any of the other Loan Documents, but excluding any income, franchise or other similar taxes.

## ARTICLE 9 - WAIVERS

**Section 9.1** <u>Waiver of Counterclaim</u>. To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender or Trustee arising out of or in any way connected with this Security Instrument, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations.

**Section 9.2** <u>Marshalling and Other Matters</u>. TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER HEREBY WAIVES THE BENEFIT OF ALL APPRAISEMENT, VALUATION, STAY, EXTENSION, REINSTATEMENT, HOMESTEAD AND REDEMPTION LAWS NOW OR HEREAFTER IN FORCE AND ALL RIGHTS OF MARSHALLING IN THE EVENT OF ANY SALE HEREUNDER OF THE PROPERTY OR ANY PART THEREOF OR ANY INTEREST THEREIN. FURTHER, TO THE EXTENT PERMITTED BY APPLICABLE LAW BORROWER HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR DECREE OF FORECLOSURE OF THIS SECURITY INSTRUMENT AND NOTICE OF INTENTION TO MATURE OR DECLARE DUE THE WHOLE OF THE DEBT ON BEHALF OF BORROWER, AND ON BEHALF OF EACH AND EVERY PERSON ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF THIS SECURITY INSTRUMENT.

**Section 9.3** <u>Waiver of Notice</u>. To the extent permitted by applicable law, Borrower shall not be entitled to any notices of any nature whatsoever from Lender or Trustee except with respect to matters for which this Security Instrument or the other Loan Documents specifically and expressly provide for the giving of notice by Lender or Trustee to Borrower and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender or Trustee with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender or Trustee to Borrower.

**Section 9.4** <u>Waiver of Statute of Limitations</u>. To the extent permitted by applicable law, Borrower hereby expressly waives and releases its right to plead any statute of limitations as a defense to payment of the Debt or performance of the Other Obligations.

**Section 9.5** <u>Waiver of Jury Trial</u>. BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS SECURITY INSTRUMENT OR

16

THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 9.6    Notice of Acceleration.** Without limiting the foregoing, Borrower hereby waives, relinquishes and agrees not to assert or take advantage of any requirement for notice of intent to accelerate and/or notice of acceleration, to the extent permitted under applicable law.

**Section 9.7    Maximum Interest.** To the extent that Lender is relying on Chapter 303, as amended, of the Texas Finance Code to determine the maximum amount of interest permitted by applicable law on the principal of the Note, Lender will utilize the weekly rate ceiling form time to time in effect as provided in such Chapter 303, as amended. To the extent United States federal law permits a greater amount of interest than is permitted under Texas law, Lender will rely on United States federal law instead of such Chapter 303, as amended, for the purpose of determining the maximum amount permitted by applicable law. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, implement any other method of computing the maximum lawful rate under such Chapter 303, as amended, or under other applicable law by giving notice, if required, to maker as provided by applicable law now or hereafter in effect. In no event shall the provisions of chapter 346 the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the indebtedness evidenced by the Loan Documents.

**Section 9.8    Indemnification Notice.** IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT THE LOAN DOCUMENTS INCLUDE INDEMNIFICATION PROVISIONS (INCLUDING, WITHOUT LIMITATION, THE INDEMNIFICATION PROVISIONS CONTAINED IN SECTION 8.1 HEREOF AND SECTIONS 3.1 AND 10.13 OF THE LOAN AGREEMENT) WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY BORROWER OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.

## ARTICLE 10 - EXCULPATION

The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

## ARTICLE 11 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with <u>Section 10.6</u> of the Loan Agreement.

## ARTICLE 12 - APPLICABLE LAW

**Section 12.1    Governing Law; Jurisdiction; Service of Process.    This Security Instrument will be governed and construed in accordance with the laws of the State in which the Property is located (without regard to conflict of law provisions thereof). All provisions of the Loan Agreement incorporated herein by reference shall be governed by, and construed in accordance with, the laws of the State in which the Property is located.**

17

**Section 12.2  Provisions Subject to Applicable Law.**  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## ARTICLE 13 - DEFINITIONS

All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in the singular or plural form and the word "Borrower" shall mean "Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine and neuter forms and the singular form of nouns and pronouns shall include the plural and vice versa.

## ARTICLE 14 - MISCELLANEOUS PROVISIONS

**Section 14.1  No Oral Change.** This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party(ies) against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**Section 14.2  Successors and Assigns.** This Security Instrument shall be binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and permitted assigns, as set forth in the Loan Agreement.  Lender shall have the right to assign or transfer its rights under this Security Instrument in connection with any assignment of the Loan and the Loan Documents.  Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Security Instrument.  Borrower shall not have the right to assign or transfer its rights or obligations under this Security Instrument without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

**Section 14.3  Inapplicable Provisions.**  If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

**Section 14.4  Headings, etc.**  The headings and captions of the various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

18

**Section 14.5  Subrogation.**  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the payment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

**Section 14.6  Entire Agreement.**  The Note, the Loan Agreement, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Obligations and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto. Borrower hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Security Instrument and the other Loan Documents.

**Section 14.7  Limitation on Lender's Responsibility.**  No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger.  Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

**Section 14.8  Principles of Construction.**  In the event of any inconsistencies between the terms and conditions of this Security Instrument and the terms and conditions of the Loan Agreement, the terms and conditions of the Loan Agreement shall control and be binding.

**Section 14.9  Severability.**  In case any one or more of the provisions of this Security Instrument, the Note, the Assignment of Leases, the Loan Agreement, any of the other Loan Documents, or any other agreement now or hereafter executed in connection with any one or more of the foregoing is held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof or thereof.  Each of the provisions of every such agreement, document or instrument shall be enforceable by Lender to the fullest extent now or hereafter permitted by law.

**Section 14.10  No Partnership or Joint Venture.**  No provision of this Security Instrument or any of the other Loan Documents shall constitute a partnership, joint venture, tenancy in common or joint tenancy between Borrower and Lender, it being intended that the only relationship created by this Security Instrument, the Loan Agreement, the Note and the other Loan Documents shall be that of debtor and creditor.

**Section 14.11  No Merger.**  So long as the Obligations owed to Lender secured hereby remain unpaid and undischarged and unless Lender otherwise consents in writing, the fee, leasehold, subleasehold and sub-subleasehold estates in and to the Property will not merge but will always remain separate and distinct, notwithstanding the union of such estates (without implying Borrower's consent to such union) either in Borrower, Lender, any tenant or any third party by purchase or otherwise, in the

19

event this Security Instrument is originally placed on a leasehold estate and Borrower later obtains fee title to the Property, such fee title will be subject and subordinate to this Security Instrument.

## ARTICLE 15 - TRUSTEE'S FEES;
## SUBSTITUTE TRUSTEE;
## POWER OF SALE

**Section 15.1   Trustee's Fees.**   Borrower shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Security Instrument.

**Section 15.2   Substitute Trustee.**   Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction.   Trustee, by acceptance of this Security Instrument, covenants to perform and fulfill the trusts herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof.   Lender may remove Trustee at any time or from time to time and select a successor trustee by filing the appropriate instrument in the office where this Security Instrument is recorded.   Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, with full power of substitution to file, execute and record any document required to appoint such substitute trustee.   In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever, Lender may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Security Instrument is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor.   Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Lender.   The procedure provided for in this paragraph for substitution of Trustee shall be in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.   Borrower agrees to the foregoing for itself, its successors and assigns.

### Section 15.3   Power of Sale.

(a)     Upon the occurrence of an Event of Default, Trustee, or the agent or successor of Trustee, at the request of Lender, shall sell or offer for sale the Property in such portions, order and parcels as Lender may determine with or without having first taken possession of same, to the highest bidder for cash at one or more public auctions in accordance with the terms and provisions of the law of the State in which the Property is located.   Such sale shall be made at the area within the courthouse of the county in which the Property (or any portion thereof to be sold) is situated (whether the parts or parcels thereof, if any, in different counties are contiguous or not, and without the necessity of having any personal property hereby secured present at such sale) which is designated by the applicable court of such County as the area in which public sales are to take place, or, if no such area is designated, at the area at the courthouse designated in the notice of sale as the area in which the sale will take place, on such day and at such times as permitted under applicable law of the State where the Property is located, after advertising the time, place and terms of sale and that portion of the Property in accordance with such law, and after having served written or printed notice of the proposed sale by certified mail on each Borrower obligated to pay the Note and other secured indebtedness secured by this Security Instrument according to the records of Lender in accordance with applicable law.   The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

20

At any such public sale, Trustee may execute and deliver in the name of Borrower to the purchaser a conveyance of the Property or any part of the Property in fee simple. In the event of any sale under this Security Instrument by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold in its entirety or in separate parcels and in such manner or order as Lender in its sole discretion may elect, and if Lender so elects, Trustee may sell the personal property covered by this Security Instrument at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State in which the Property is located, and one or more exercises of the powers herein granted shall not extinguish or exhaust such powers, until all the Property is sold or the Note and other secured indebtedness is paid in full. If the Note and other secured indebtedness is now or hereafter further secured by any chattel mortgages, pledges, contracts or guaranty, assignments of lease, or other security instruments, Lender at its option may exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Lender may determine.

(b)     Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, Lender may bid for and purchase the Property and shall be entitled to apply all or any part of the Debt as a credit to the purchase price.

(c)     In the event of a foreclosure or a sale of all or any portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order Lender in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith (including, without limitation, attorneys' fees and expenses), to fees and expenses of Trustee (including, without limitation, Trustee's attorneys' fees and expenses), to insurance premiums, liens, assessments, taxes and charges (including, without limitation, utility charges advanced by Lender), to payment of the outstanding principal balance of the Debt, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Borrower, or to the person or entity lawfully entitled thereto.

(d)     In case Trustee shall have proceeded to enforce any right or remedy under this Security Instrument by foreclosure, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason, or shall have been determined adversely to Lender, then in every case, Borrower, Lender and Trustee shall be restored to their former positions and the rights, powers and remedies of Lender and Trustee herein provided or arising, or existing otherwise as herein set forth shall continue as if no such proceeding had been taken.

**Section 15.4     Acceptance by Trustee.** Trustee accepts the Property when this Security Instrument, duly executed and acknowledged, becomes a public record as provided by law. Trustee shall not be obligated to perform any act required hereunder unless the performance of such act is requested in writing and Trustee is reasonably indemnified against loss, cost, liability and expense.

**Section 15.5     Acts of Trustee.** From time to time, upon written request of Lender and without affecting the liability of any person for payment of any indebtedness or performance of the obligations secured hereby, Trustee may, without liability therefor and without notice: reconvey all or any part of the Property; consent to the making of any map or plat thereof; join in granting any easement thereon; join in any declaration of covenants and restrictions; or join in any extension agreement or any agreement subordinating the lien or charge hereof. Trustee may from time to time apply in any court of competent jurisdiction for aid and direction in the execution of the trust hereunder and the enforcement of the rights and remedies available hereunder, and Trustee may obtain orders or decrees directing or confirming or approving acts in the execution of said trust and the enforcement of said remedies. Trustee has no obligation to notify any party of any pending sale or any action or proceeding unless held or commenced and maintained by Trustee under this Security Instrument.

21

**Section 15.6** **No Liability of Trustee**.

(a)     The Trustee shall not be liable for any error of judgment or act done by the Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever, except due to the Trustee's negligence, breach of agreement or willful misconduct. The Trustee shall have the right to rely on any instrument, document or signature authorizing any action taken or proposed to be taken by them hereunder, believed by the Trustee in good faith to be genuine. All moneys received by the Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other moneys (except to the extent required by law or under the Loan Documents), and the Trustee shall be under no liability for interest on any moneys received by the Trustee hereunder.

(b)     Borrower shall indemnify, protect, defend and hold Lender and Trustee harmless, singularly and jointly, from all costs and expenses, including reasonable attorney's fees, incurred by them or any of them by reason of this Security Instrument, including any legal action to which Lender or Trustee shall become a party. Any money so paid or expended by Lender or Trustee shall be due and payable upon demand together with interest at the Default Rate from the date incurred and shall be secured by this Security Instrument.

**Section 15.7** **Trustee Powers**. Trustee may exercise any of its powers through appointment of attorney-in-fact or agents. Trustee may select and employ legal counsel at the expense of Borrower.

**Section 15.8** **Priority**. All amounts advanced by either of Lender or Trustee hereunder shall be secured by this Security Instrument with priority dating back to the date of the grant of this Security Instrument.

**Section 15.9** **Ratification**. Borrower hereby ratifies and confirms every act that Trustee and its successors may lawfully do at the Property by virtue of powers granted to Trustee hereunder.

## ARTICLE 16 - STATE-SPECIFIC PROVISIONS

**Section 16.1** **Principles of Construction**. In the event of any inconsistencies between the terms and conditions of this Article 16 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 16 shall control and be binding.

(a)     **Fixture Filing.**  Without limiting any provision of this Security Instrument, this Security Instrument shall also constitute and be effective as a financing statement covering accounts subject to subsection (e) of Section 9.103 of the Texas Business and Commerce Code, as amended (or any successor statute thereof).

(b)     **Waiver of Deficiency Statute.**

(i)     Waiver. In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Borrower agrees that, notwithstanding the provisions of Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as the same may be amended from time to time), and to the extent permitted by law (but subject to the provisions of Section 3.1 of the Loan Agreement), Lender shall be entitled to seek a deficiency judgment from Borrower and any other party obligated on the Note equal to the difference between the amount owing on the Note and the amount for which the Property was sold pursuant to judicial or nonjudicial foreclosure sale. Borrower expressly recognizes that this section constitutes a waiver of the above

22

cited provisions of the Texas Property Code which would otherwise permit Borrower and other persons against whom recovery of deficiencies is sought or any indemnitor or guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Borrower further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Borrower, any indemnitor or guarantor, and others against whom recovery of a deficiency is sought.

(ii) <u>Alternative to Waiver.</u> Alternatively, in the event the waiver provided for in subsection (a) above is determined by a court of competent jurisdiction to be unenforceable, the provisions of this Section 16.1 (b) shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time). In such event, (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than 12 months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any estimated holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in item (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five (5) years' experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

(c) <u>Texas Finance Code §307.052 Collateral Protection Insurance Notice.</u> Borrower shall provide and maintain in force at all times any and all insurance as required pursuant to the terms and conditions of the Loan Agreement. BORROWER IS REQUIRED TO: (I) KEEP THE PERSONALTY INSURED AGAINST DAMAGE IN THAT AMOUNT EQUAL TO THE FULL REPLACEMENT COST OF THE PERSONALTY; (II) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF LOSS. BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS. IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN THE PRECEDING TWO SENTENCES OF THIS SECTION 16.l(c), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S EXPENSE.

**Section 16.2 Collateral Assignment.** Further, it is the intention. of Borrower and Lender that this instrument also constitute a collateral assignment of the Rents in accordance with the provisions of Chapter 64 of the Texas Property Code, the Texas Assignment of Rents Act. Borrower hereby grants to Lender a security interest in the Rents. This assignment is intended to be and constitutes

23

a present and unconditional assignment. It is noted that in 2011 the Texas Legislature enacted two Chapters 64 to the Texas Property Code and that the Chapter 64 referred to in this section is the one that was enacted by S.B. 889, § 2, 82nd Leg., effective June 17, 2011, relating to Assignment of Rents to Lienholder. In the event that when the Texas Legislature corrects this duplicate numbering it assigns a different chapter number to the chapter relating to Assignment of Rents to Lienholder, all references herein to Chapter 64 and to sections of Chapter 64 shall be deemed to mean such re-assigned chapter and sections thereof.

## ARTICLE 17

**Section 17.1** **No Conflicts.** In the event of any inconsistencies between the terms and conditions of this Security Instrument and the terms and conditions of the Loan Agreement, the terms and conditions of the Loan Agreement shall control and be binding. Notwithstanding the foregoing, to the extent that any of the terms and conditions of the Loan Agreement conflict with any of the terms and conditions set forth in Article 16 above, the terms and conditions of Article 16 shall control; provided, however, that this sentence shall not apply to Section 3.1 of the Loan Agreement which Section 3.1 of Loan Agreement shall, in any event, control over Article 16 of this Security Instrument with respect to any inconsistency.

**NO ORAL AGREEMENTS. THIS WRITTEN AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[THE REMAINDER OF THE PAGE IS INTENTIONALLY DELETED]

4822-0146-8961, v. 4

IN WITNESS WHEREOF, this Security Instrument has been executed by Borrower as of the day and year first above written.

**BORROWER:**

OMNI LION'S RUN, L.P., a Texas limited partnership

By: Omni Lion Management, Inc., a Texas corporation, its general partner

By: _____
Name: Gregory G. Hall
Title: Director

STATE OF ___Ty___ §
                    §
COUNTY OF __Williamson__ §

This instrument was acknowledged before me on February 18, 2015, by Gregory G. Hall, the Director of Omni Lion Management, Inc., a Texas Corporation, the General Partner of Omni Lion's Run, L.P., a Texas limited partnership, on behalf of said entity.

_____
Notary Public, State of _____

TAMRA WILSON
Notary Public, State of Texas
My Commission Expires
JULY 24, 2016

*(Signature Page – Deed of Trust, Security Agreement, Assignment of Leases and Fixture Filing – Lion's Run)*

## EXHIBIT "A"

### [LEGAL DESCRIPTION]

**FOR A 8.5922 ACRE (374279 SQ. F.T) TRACT OF LAND OUT OF THE J. ROBERTS SURVEY ABS. NO. 723, BELL COUNTY, TEXAS BEING THE SAME TRACT OF LAND DESCRIBED AS 8.59 ACRES, BY DEED CONVEYED TO OMNI LIONS RUN L.P., RECORDED IN VOL. 5532, PG. 812, DEED RECORDS, BELL COUNTY TEXAS, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS DESCRIPTION AS FOLLOWS:**

**BEGINNING** at a concrete monument found on the West R.O.W. line of Central Texas Express Way, at the Southeast corner of a 4.215 acre Tract of land conveyed to Articulate Inc., by deed recorded in Vol. 3248 pg. 208, Deed Records of Bell County, Texas, same being the Northeast corner of this tract, and the **POINT OF BEGINNING** of this tract.

THENCE along the said West R.O.W. line of Central Texas Express Way, the following three (3) courses:

1) S 53°39' 52" W, a distance of 588.24 feet to an iron rod set.
2) S 49°51'09"W, a distance of 250.34 feet to a Concrete monument found.
3) S 55°45'16"W, a distance of 88.65 feet to a iron rod set at the Northeast corner of a 2.72 Acre tract of land conveyed to LIJ Properties by deed recorded in Doc. No. 201000031204, Official Public Records, Bell County, Texas, for the Southeast corner of this Tract.

THENCE N 52°10'51"W along the North Line of the said 2.724 acre tract, pass at a distance of 211.11 feet, the common corner of the said 2.724 acre tract, and a 1.745 acre tract, conveyed to LIJ properties by deed recorded in Doc. No. 201000031203, Official Public Records, Bell County, Texas, for a total distance of 444.34 feet to a ½" iron rod found in west line of the said 1.745 acre tract, at the Southeast corner of a 4.28 acre tract of land conveyed to Omni Look Out Ridge L.P. by deed recorded in Doc. No. 200700008179, Official Public Records, Bell County, Texas, at the Southwest corner of this tract.

THENCE along the East line of the said 4.28 acre tract, the following two (2) courses:

1) N 37° 47' 21" E, a distance of 194.07 feet to an iron rod found.
2) N 02°15' 55" W, a distance of 224.12 feet to a ½" iron rod found at the Northeast corner of the said 4.28 acre tract, at the Southwest corner of a 11.436 acre tract of land conveyed to Will Properties Inc., by deed recorded in Vol. 5863, Pg. 394, Deed Records, Bell County, Texas., for an angle point of this tract.

THENCE, along the common line of the said 11.436 acre tract, and this tract, the following four (4) courses:

1) N 71° 11'50" E, a distance of 10.49 feet to an iron rod found.
2) N 70° 39'51" E, a distance of 108.60 feet to an iron rod found.
3) S 64° 16'38" E, a distance of 509.46 feet to a ½" iron rod set.
4) N 22° 31' 28" E, a distance of 259.68 feet to a ½" iron rod found at the Southwest corner of the said 4.215 acre tract, for the Northwest corner of this tract.

THENCE S 64° 22' 30" E, along the South line of the said 4.215 acre tract, a distance of 342.25 feet to the **POINT OF BEGINNING**, and containing 8.5922 acres, (374279 Sq. Ft. more or less).

# **** Electronically Filed Document ****

## Bell County, Tx
## Shelley Coston
## County Clerk

Document Number: 2015-6121

Recorded As     : ERX-RECORDINGS

| | |
|---|---|
| Recorded On: | February 19, 2015 |
| Recorded At: | 10:26:53 am |
| Number of Pages: | 29 |
| Book-VI/Pg: | Bk-OR VI-9189 Pg-32 |
| Recording Fee: | $119.00 |

Parties:

Direct- OMNI LIONS RUN LP

Indirect- CANTOR COMMERCIAL REAL ESTATE LENDING LP

| | |
|---|---|
| Receipt Number: | 228746 |
| Processed By: | Katie Salamone |

(Parties listed above are for Clerks reference only)

*********** THIS PAGE IS PART OF THE INSTRUMENT ************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.



I hereby certify that this instrument was filed on the date and time stamped hereon and was duly recorded in the Real Property Records in Bell County, Texas

**Shelley Coston**
**Bell County Clerk**

# **EXHIBIT D**

## **Assignment of Rents and Leases**

1405 1448

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE.**

OMNI LION'S RUN, L.P., as assignor
(Borrower)

to

CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., as assignee
(Lender)

---

## ASSIGNMENT OF LEASES AND RENTS

---

Dated:      As of February 18, 2015

Location:   701 East Central Texas Expressway
            Harker Heights, Texas 76548

County:     Bell County, Texas

PREPARED BY AND UPON
RECORDATION RETURN TO:

Duval & Stachenfeld LLP
555 Madison Avenue, 6th Floor
New York, New York 10022
Attention: Zachary Samton, Esq. & File Manager
File No.: 3302.0043

**This document serves as a security instrument with respect to the collateral assignment of the Rents described herein in accordance with Chapter 64 of the Texas Property Code.**

4849-5293-2385, v. 4

## ASSIGNMENT OF LEASES AND RENTS

This ASSIGNMENT OF LEASES AND RENTS (as amended, restated, supplemented or otherwise modified from time to time, this "*Assignment*"), is made as of February 1̸8̸, 2015, by OMNI LION'S RUN, L.P., a Texas limited partnership, as assignor, having an address at 1102 North Austin Avenue, Georgetown, Texas 78626 (together with its permitted successors and assigns, collectively, "*Borrower*"), to CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., a Delaware limited partnership, as assignee, having an address 110 East 59th Street, 6th Floor, New York, New York 10022 (together with its successors and assigns, collectively, "*Lender*").

### RECITALS:

A.    This Assignment is given in connection with a loan in the principal sum of Five Million Four Hundred Thousand and No/100 Dollars ($5,400,000.00) (the "*Loan*") made by Lender to Borrower pursuant to that certain Loan Agreement, dated as of the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "*Loan Agreement*"), and evidenced by that certain Promissory Note, dated the date hereof, made by Borrower to Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "*Note*"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

B.    The Note is secured by, among other things, that certain Deed of Trust, Security Agreement, Assignment of Leases and Fixture Filing, dated the date hereof (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "*Security Instrument*") made by Borrower for the benefit of Lender.

C.    Borrower desires to further secure the payment of the Debt and the performance of all of its Other Obligations under the Note, the Security Instrument, the Loan Agreement and the other Loan Documents.

D.    This Assignment is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents is secured hereby, and each and every term and provision of the Loan Agreement, the Note and the Security Instrument, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Assignment.

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Assignment:

### ARTICLE 1: ASSIGNMENT

1.1    **Property Assigned**.  Borrower hereby absolutely and unconditionally assigns and grants to Lender the following property, rights, interests and estates, now owned, or hereafter acquired by Borrower:

(a)    Leases.  All existing and future Leases (including the right to enforce, at law, in equity or by other means, such Leases) affecting the use, enjoyment or occupancy of all or any portion of any space in that certain lot or piece of land, more particularly described in **Exhibit "A"** annexed hereto and made a part hereof, together with all or any part of the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter

located thereon (collectively, the *"Property"*), and every modification, amendment or other agreement relating to such Leases and the right title and interest of Borrower, its successors and assigns, therein and thereunder. The term "Leases" shall include all agreements, whether or not in writing, affecting the use, enjoyment or occupancy of the Property or any portion thereof now or hereafter made, whether made before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the *"Bankruptcy Code"*) together with any extension, renewal or replacement of the same. This Assignment of other present and future leases and present and future agreements is effective without further or supplemental assignment.

(b)     Rents. All Rents, which term shall include Rents paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code.

(c)     Bankruptcy Claims. All of Borrower's claims and rights (the *"Bankruptcy Claims"*) to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code.

(d)     Lease Guaranties. All of Borrower's right, title and interest in and claims under any and all lease guaranties, letters of credit and any other credit support (individually, a *"Lease Guaranty"*, and collectively, the *"Lease Guaranties"*) given by any guarantor in connection with any of the Leases or leasing commissions (individually, a *"Lease Guarantor"*, and collectively, the *"Lease Guarantors"*) to Borrower.

(e)     Proceeds. All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties and/or the Bankruptcy Claims.

(f)     Other. All rights, powers, privileges, options and other benefits of Borrower as lessor under any of the Leases and the beneficiary under any of the Lease Guaranties, including, without limitation, the immediate and continuing right to make claims for, and to receive and collect and acknowledge receipt for, all Rents payable or receivable under the Leases and all sums payable under the Lease Guaranties or pursuant thereto (and to apply the same to the payment of the Debt or the Other Obligations), and to do all other things which Borrower or any lessor is or may become entitled to do under any of the Leases or the Lease Guaranties.

(g)     Entry. The right, at Lender's option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver, to collect the Rents.

(h)     Power of Attorney. Borrower's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 3.1 of this Assignment and any or all other actions designated by Lender for the proper management and preservation of the Property.

(i)     Other Rights and Agreements. Any and all other rights of Borrower in and to the items set forth in subsections (a) through (h) above, and all amendments, modifications, replacements, renewals and substitutions thereof.

## ARTICLE 2 - TERMS OF ASSIGNMENT

2.1     **Present Assignment and License Back**. It is intended by Borrower that this Assignment constitute a present, absolute assignment of the Leases, Rents, Lease Guaranties and Bankruptcy Claims, and not an assignment for additional security only. Nevertheless, subject to the terms of this Section 2.1, the Loan Agreement, the Clearing Account Agreement and the Cash Management Agreement, Lender grants to Borrower a revocable license to collect, receive, use and enjoy the Rents and other sums due

2

under the Lease Guaranties, Borrower shall hold the Rents and all sums received pursuant to any Lease Guaranty, or a portion thereof sufficient to discharge all current sums due on the Debt, in trust for the benefit of Lender for use in the payment of such sums.

2.2 **Notice To Lessees**. Borrower hereby authorizes and directs the lessees named in the Leases, any other future lessees or occupants of the Property, and all Lease Guarantors to pay over to Lender, or to such other party as Lender may direct, all Rents and all sums due under any Lease Guaranties upon receipt from Lender of written notice to the effect that Lender is then the holder of this Assignment and that an Event of Default exists, and to continue doing so until otherwise notified by Lender.

2.3 **Incorporation By Reference**. All representations, warranties, covenants, conditions and agreements contained in the Loan Agreement and the other Loan Documents, as the same may be modified, renewed, substituted or extended from time to time, are hereby made a part of this Assignment to the same extent and with the same force as if fully set forth herein.

2.4 **Collateral Assignment**. Further, it is the intention of Borrower and Lender that this instrument also constitute a collateral assignment of the Rents in accordance with the provisions of Chapter 64 of the Texas Property Code, the Texas Assignment of Rents Act. Borrower hereby grants to Lender a security interest in the Rents. This assignment is intended to be and constitutes a present and unconditional assignment. It is noted that in 2011 the Texas Legislature enacted two Chapters 64 to the Texas Property Code and that the Chapter 64 referred to in this section is the one that was enacted by S.B. 889, § 2, 82nd Leg., effective June 17, 2011, relating to Assignment of Rents to Lienholder. In the event that when the Texas Legislature corrects this duplicate numbering it assigns a different chapter number to the chapter relating to Assignment of Rents to Lienholder, all references herein to Chapter 64 and to sections of Chapter 64 shall be deemed to mean such re-assigned chapter and sections thereof.

## ARTICLE 3 - REMEDIES

3.1 **Remedies of Lender**. Upon or at any time after the occurrence of an Event of Default, the license granted to Borrower in Section 2.1 of this Assignment shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents and all sums due under any Lease Guaranties, whether or not Lender enters upon or takes control of the Property. In addition, Lender may, at its option, without waiving such Event of Default, without regard to the adequacy of the security for the Obligations, either in person or by agent, nominee or attorney, with or without bringing any action or proceeding, or by a receiver appointed by a court, dispossess Borrower and its agents and servants from the Property, without liability for trespass, damages or otherwise, and exclude Borrower and its agents or servants wholly therefrom, and take possession of the Property and all books, records and accounts relating thereto and have, hold, manage, lease and operate the Property on such terms and for such period of time as Lender may deem proper, and either with or without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents and all sums due under all Lease Guaranties, including, without limitation, those past due and unpaid, with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as Lender may deem proper, and may apply the Rents and sums received pursuant to any Lease Guaranties to the payment and performance of the following in such order and proportion as Lender in its sole discretion may determine, any law, custom or use to the contrary notwithstanding: (a) all expenses of managing and securing the Property, including, without being limited thereto, the salaries, fees and wages of a managing agent and such other employees or agents as Lender may deem necessary or desirable and all expenses of operating and maintaining the Property, including, without being limited thereto, all taxes, charges, claims, assessments, water charges, sewer rents and any other liens, and premiums for all insurance which Lender may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and

3

all expenses incident to taking and retaining possession of the Property; and (b) the Obligations, together with all costs and reasonable attorneys' fees. In addition, upon the occurrence of an Event of Default, Lender, at its option, may (i) complete any construction on the Property in such manner and form as Lender deems advisable, (ii) exercise all rights and powers of Borrower, including, without limitation, the right to negotiate, execute, cancel, enforce or modify any Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents from the Property and all sums due under any Lease Guaranties, (iii) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupancy of such part of the Property as may be in the possession of Borrower or its Affiliates, or (iv) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise.

   3.2 **Other Remedies**.  Nothing contained in this Assignment, and no act done or omitted by Lender pursuant to the power and rights granted to Lender hereunder, shall be deemed to be a waiver by Lender of its rights and remedies under the Loan Agreement, the Note, the Security Instrument or the other Loan Documents, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Lender under the terms thereof.  The right of Lender to collect the Obligations and to enforce any other security therefor held by it may be exercised by Lender either prior to, simultaneously with, or subsequent to any action taken by Lender hereunder.  Borrower hereby absolutely, unconditionally and irrevocably waives any and all rights to assert any setoff, counterclaim or crossclaim of any nature whatsoever with respect to the Obligations of Borrower under this Assignment, the Loan Agreement, the Note, the Security Instrument or the other Loan Documents or otherwise with respect to the Loan in any action or proceeding brought by Lender to collect same, or any portion thereof, or to enforce and realize upon the lien and security interest created by this Assignment, the Loan Agreement, the Note, the Security Instrument or any of the other Loan Documents (*provided, however*, that the foregoing shall not be deemed a waiver of (a) Borrower's right to assert any compulsory counterclaim if such counterclaim is compelled under local law or rule of procedure, or (b) Borrower's right to assert any claim which would constitute a defense, setoff, counterclaim or crossclaim of any nature whatsoever against Lender in any separate action or proceeding).

   3.3 **Other Security**.  Lender may (i) take or release other security for the payment of the Debt and performance of the Other Obligations (including, without limitation, the payment of the Debt, (ii) release any party primarily or secondarily liable therefor, and (iii) apply any other security held by it to the payment of the Debt and performance of the Other Obligations without prejudice to any of its rights under this Assignment.

   3.4 **Non-Waiver**.  The exercise by Lender of the option granted it in Section 3.1 of this Agreement and the collection of the Rents and sums due under the Lease Guaranties and the application thereof as herein provided, shall not be considered a waiver of any Default or Event of Default by Borrower under the Note, the Loan Agreement, the Security Instrument, the Leases, this Assignment or the other Loan Documents.  The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (a) the failure of Lender to comply with any request of Borrower or any other party to take any action to enforce any of the provisions hereof or of the Loan Agreement, the Note or the other Loan Documents, (b) the release, regardless of consideration, of the whole or any part of the Property, or (c) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of this Assignment, the Loan Agreement, the Note, the Security Instrument or the other Loan Documents.  Lender may resort for the payment of the Debt and performance of the Other Obligations to any other security held by Lender in such order and manner as Lender, in its sole discretion, may elect.  Lender may take any action to recover the Obligations, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of

4

Lender thereafter to enforce its rights under this Assignment. The rights of Lender under this Assignment shall be separate, distinct and cumulative, and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.

3.5 **Bankruptcy.** (a) Upon or at any time after the occurrence of an Event of Default, Lender shall have the right to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b) If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject such Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten (10) day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code, and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after Lender's notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE 4 - NO LIABILITY, FURTHER ASSURANCES

4.1 **No Liability of Lender.** This Assignment shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender. Lender shall not be liable for any loss sustained by Borrower resulting from Lender's failure to let the Property after an Event of Default or from any other act or omission of Lender in managing the Property after an Event of Default, unless such loss is caused by the willful misconduct or bad faith of Lender. Lender shall not be obligated to perform or discharge any obligation, duty or liability under the Leases or any Lease Guaranties or under or by reason of this Assignment and Borrower shall, and hereby agrees to, indemnify Indemnified Parties for, and to hold Indemnified Parties harmless from (a) any and all liability, loss or damage which may or might be incurred under the Leases, any Lease Guaranties or under or by reason of this Assignment, and (b) from any and all claims and demands whatsoever, including the defense of any such claims or demands which may be asserted against any Indemnified Parties by reason of any alleged obligations and undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in the Leases or any Lease Guaranties. Should Indemnified Parties incur any such liability, the amount thereof, including costs, expenses and reasonable attorneys' fees, shall be secured by this Assignment and by the Security Instrument and the other Loan Documents, and Borrower shall reimburse such Indemnified Parties therefor immediately upon demand and upon the failure of Borrower to do Lender may, at its option, declare all sums secured by this Assignment and by the Security Instrument and the other Loan Documents immediately due and payable. This Assignment shall not operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor for the carrying out of any of the terms and conditions of the Leases or any Lease Guaranties; nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other parties, or for any dangerous or defective condition of the Property including, without limitation, the presence of any Hazardous Substances (as defined in the Environmental Indemnity), or for any negligence in the

5

management, upkeep, repair or control of the Property resulting in loss or injury or death to any tenant, licensee, employee or stranger. For purposes of this Article 4, the term "*Indemnified Parties*" means Lender and any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan secured hereby, any Person in whose name the encumbrance created by this Assignment is or will have been recorded, persons and entities who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, investors or prospective investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business). The provisions of this Section 4.1 shall survive any payment or prepayment of the Loan and any foreclosure or satisfaction of the Security Instrument.

4.2 **No Mortgagee in Possession**. Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession" in the absence of the taking of actual possession of the Property by Lender. In the exercise of the powers herein granted to Lender, no liability shall be asserted or enforced against Lender, all such liability being expressly waived and released by Borrower.

4.3 **Further Assurances**. Borrower will, at the cost of Borrower and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, conveyances, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring and confirming unto Lender the property and rights hereby assigned or intended now or hereafter to be assigned, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering or recording this Assignment and, on demand, will execute and deliver, and hereby authorizes Lender to execute in the name of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or comparable security instruments, to evidence more effectively the lien and security interest hereof in and upon the Leases.

## ARTICLE 5 - MISCELLANEOUS PROVISIONS

5.1 **No Conflicts**. In the event of any inconsistencies between the terms and conditions of this Assignment and the terms and conditions of the Loan Agreement, except with respect to the matters relating to the creation, perfection and procedures relating to the enforcement of this Assignment for which the provisions of this Assignment shall control, the terms and conditions of the Loan Agreement shall control and be binding.

5.2 **No Oral Change**. This Assignment and any provisions hereof may not be modified, amended, waived, extended, changed, discharged or terminated orally, or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom the enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

5.3 **General Definitions**. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in singular or plural form and the word "Borrower" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or interest therein," the word "Lender" shall mean "Lender

6

and any subsequent holder of the Note, the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Agreement, the word "Property" shall include any portion of the Property and any interest therein, the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorney's, paralegal and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder; whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

5.4 **Inapplicable Provisions**. All rights, powers and remedies provided in this Assignment may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Assignment invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law. If any term of this Assignment or any application thereof shall be invalid or unenforceable, the remainder of this Assignment and any other application of the term shall not be affected thereby.

5.5 **Governing Law**. This Assignment shall be governed in accordance with the terms and provisions of <u>Section 10.3</u> of the Loan Agreement.

5.6 **Termination of Assignment**. Upon payment in full of the Obligations, this Assignment shall become and be void and of no effect.

5.7 **Notices**. All notices or other written communications hereunder shall be delivered in accordance with <u>Section 10.6</u> of the Loan Agreement.

5.8 **WAIVER OF TRIAL BY JURY**. **BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THE NOTE, THIS ASSIGNMENT, THE SECURITY INSTRUMENT, THE NOTE, OR THE OTHER LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.**

5.9 **Exculpation**. The provisions of <u>Section 3.1</u> of the Loan Agreement are hereby incorporated by reference into this Assignment to the same extent and with the same force as if fully set forth herein.

5.10 **Successors and Assigns**. This Assignment shall be binding upon and shall inure to the benefit of Borrower and Lender and their respective successors and permitted assigns forever, Lender shall have the right to assign, sell, pledge, participate, delegate, or transfer, as applicable, to one or more Persons, all or any portion of its rights and obligations under this Assignment in connection with any assignment of the Loan and the Loan Documents to any Person. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment. Borrower shall not have the right to assign, delegate or transfer its rights or obligations under this Assignment without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment, delegation or transfer without such consent shall be null and void.

7

5.11 **Headings, Etc.** The headings and captions of the various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

## ARTICLE 6 - STATE-SPECIFIC PROVISIONS

6.1 In the event of any inconsistencies between the terms and conditions of this Article 6 and the other terms and provisions of this Assignment, the terms and conditions of this Article 6 shall control and be binding:

(a) **SPECIFIC NOTICE. IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT THIS ASSIGNMENT INCLUDES INDEMNIFICATION PROVISIONS WHICH, IN CERTAIN CIRCUMSTANCES, COULD INCLUDE AN INDEMNIFICATION BY BORROWER OF LENDER FROM CLAIMS OR LOSSES ARISING AS A RESULT OF LENDER'S OWN NEGLIGENCE.**

(b) **THIS ASSIGNMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, EXCEPT TO THE EXTENT THAT ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, IN WHICH CASE SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING.**

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

4849-5293-2385, v. 4

IN WITNESS WHEREOF, Borrower has executed this Assignment of Leases and Rents the day and year first above written.

**BORROWER:**

OMNI LION'S RUN, L.P., a Texas limited partnership

By: Omni Lion Management, Inc., a Texas corporation, its general partner

By: _____
Name: Gregory G. Hall
Title: Director

STATE OF ___TX___ §
§
COUNTY OF __Williamson__ §

This instrument was acknowledged before me on February 18th, 2015, by Gregory G. Hall, the Director of Omni Lion Management, Inc., a Texas Corporation, the General Partner of Omni Lion's Run, L.P., a Texas limited partnership, on behalf of said entity.

TAMRA WILSON
Notary Public, State of Texas
My Commission Expires
JULY 24, 2016

_____
Notary Public, State of ___TX___

*(Signature Page – Assignment of Leases and Rents – Lion's Run)*

## EXHIBIT "A"

### [LEGAL DESCRIPTION]

**FOR A 8.5922 ACRE (374279 SQ. F.T) TRACT OF LAND OUT OF THE J. ROBERTS SURVEY ABS. NO. 723, BELL COUNTY, TEXAS BEING THE SAME TRACT OF LAND DESCRIBED AS 8.59 ACRES, BY DEED CONVEYED TO OMNI LIONS RUN L.P., RECORDED IN VOL. 5532, PG. 812, DEED RECORDS, BELL COUNTY TEXAS, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS DESCRIPTION AS FOLLOWS:**

**BEGINNING** at a concrete monument found on the West R.O.W. line of Central Texas Express Way, at the Southeast corner of a 4.215 acre Tract of land conveyed to Articulate Inc., by deed recorded in Vol. 3248 pg. 208, Deed Records of Bell County, Texas, same being the Northeast corner of this tract, and the **POINT OF BEGINNING** of this tract.

THENCE along the said West R.O.W. line of Central Texas Express Way, the following three (3) courses:

1) S 53°39' 52" W, a distance of 588.24 feet to an iron rod set.
2) S 49°51'09"W, a distance of 250.34 feet to a Concrete monument found.
3) S 55°45'16"W, a distance of 88.65 feet to a iron rod set at the Northeast corner of a 2.72 Acre tract of land conveyed to LIJ Properties by deed recorded in Doc. No. 201000031204, Official Public Records, Bell County, Texas, for the Southeast corner of this Tract.

THENCE N 52°10'51"W along the North Line of the said 2.724 acre tract, pass at a distance of 211.11 feet, the common corner of the said 2.724 acre tract, and a 1.745 acre tract, conveyed to LIJ properties by deed recorded in Doc. No. 201000031203, Official Public Records, Bell County, Texas, for a total distance of 444.34 feet to a ½" iron rod found in west line of the said 1.745 acre tract, at the Southeast corner of a 4.28 acre tract of land conveyed to Omni Look Out Ridge L.P. by deed recorded in Doc. No. 200700008179, Official Public Records, Bell County, Texas, at the Southwest corner of this tract.

THENCE along the East line of the said 4.28 acre tract, the following two (2) courses:

1) N 37° 47' 21" E, a distance of 194.07 feet to an iron rod found.
2) N 02°15' 55" W, a distance of 224.12 feet to a ½" iron rod found at the Northeast corner of the said 4.28 acre tract, at the Southwest corner of a 11.436 acre tract of land conveyed to Will Properties Inc., by deed recorded in Vol. 5863, Pg. 394, Deed Records, Bell County, Texas., for an angle point of this tract.

THENCE, along the common line of the said 11.436 acre tract, and this tract, the following four (4) courses:

1) N 71° 11'50" E, a distance of 10.49 feet to an iron rod found.
2) N 70° 39'51" E, a distance of 108.60 feet to an iron rod found.
3) S 64° 16'38" E, a distance of 509.46 feet to a ½" iron rod set.
4) N 22° 31' 28" E, a distance of 259.68 feet to a ½" iron rod found at the Southwest corner of the said 4.215 acre tract, for the Northwest corner of this tract.

THENCE S 64° 22' 30" E, along the South line of the said 4.215 acre tract, a distance of 342.25 feet to the **POINT OF BEGINNING,** and containing 8.5922 acres, (374279 Sq. Ft. more or less).

# Bell County, Tx
# Shelley Coston
# County Clerk

Document Number: 2015-6122

Recorded As      : ERX-RECORDINGS

| | |
|---|---|
| Recorded On: | February 19, 2015 |
| Recorded At: | 10:27:31 am |
| Number of Pages: | 12 |
| Book-Vl/Pg: | Bk-OR  VI-9189  Pg-61 |
| Recording Fee: | $51.00 |

Parties:

Direct- OMNI LIONS RUN LP

Indirect- CANTOR COMMERCIAL REAL ESTATE LENDING LP

| | |
|---|---|
| Receipt Number: | 228746 |
| Processed By: | Katie Salamone |

(Parties listed above are for Clerks reference only)

---

**\*\*\*\*\*\*\*\*\*\*\*\* THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\*\***

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

---



I hereby certify that this instrument was filed on the date and time stamped hereon and was duly recorded in the Real Property
Records in Bell County, Texas

Shelley Coston
Bell County Clerk

<u>**EXHIBIT E**</u>

**Assignment of Management Agreement**

## ASSIGNMENT OF MANAGEMENT AGREEMENT
## AND SUBORDINATION OF MANAGEMENT FEES

This ASSIGNMENT OF MANAGEMENT AGREEMENT AND SUBORDINATION OF MANAGEMENT FEES (as amended, restated, supplemented or otherwise modified from time to time, this "*Assignment*"), is made as of February 18th, 2015, by OMNI LION'S RUN, L.P., a Texas limited partnership, having an address at 1102 North Austin Avenue, Georgetown, Texas 78626 (together with its permitted successors and assigns, collectively "*Borrower*"), to CANTOR COMMERCIAL REAL ESTATE LENDING, L.P., a Delaware limited partnership, having an address at 110 East 59th Street, 6th Floor, New York, New York 10022 (together with its successors and assigns, collectively "*Lender*"), and is consented and agreed to by Gregory G. Hall (d/b/a Hall Properties), an individual, having an address at 1102 North Austin Avenue, Georgetown, Texas 78626 (together with its permitted successors and assigns, collectively "*Manager*").

RECITALS:

A.    Borrower, by its Promissory Note of even date herewith given to Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Note*"), is indebted to Lender in the principal sum of Five Million Four Hundred Thousand and No/100 Dollars ($5,400,000.00) (the "*Loan*") advanced pursuant to that certain Loan Agreement of even date herewith between Borrower and Lender (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Loan Agreement*").

B.    The Loan is secured by, among other things, a Deed of Trust, Security Agreement, Assignment of Leases and Fixture Filing, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Security Instrument*"), which grants Lender a first priority lien on the property encumbered thereby and known as 701 East Central Texas Expressway, Harker Heights, Texas 76548 (the "*Property*").   The Note, the Loan Agreement, the Security Instrument, this Assignment and any of the other documents evidencing or securing the Loan or executed or delivered in connection therewith (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time) are collectively referred to as the "*Loan Documents*".

C.    Pursuant to that certain Property Management Agreement, dated November, 2004, between Borrower and Manager (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Management Agreement*") (a true and correct copy of which is attached hereto as **Exhibit "A"**), Borrower employed Manager exclusively to rent, lease, operate and manage the Property and Manager is entitled to certain management fees (the "*Management Fees*") thereunder.

D.    Lender requires as a condition to the making of the Loan that Borrower assign the Management Agreement to Lender and that Manager subordinate its interest under the Management Agreement in lien and payment to the Security Instrument and the other Loan Documents as set forth below.

E.    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

NOW THEREFORE, in consideration of the above and the material promises contained in this Assignment, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1

1.    **Assignment of Management Agreement**.  As additional collateral security for the Loan, Borrower hereby conditionally transfers, sets over and assigns to Lender all of Borrower's right, title and interest in and to the Management Agreement, said transfer and assignment to automatically become a present, unconditional assignment, at Lender's option, upon the occurrence of an Event of Default.

2.    **Subordination of Management Agreement**.  The Management Agreement and any and all liens, rights and interests (whether choate or inchoate and including, without limitation, all mechanic's and materialmen's liens under applicable law) owed, claimed or held by Manager in and to the Property, are, and shall be in all respects, subordinate and inferior to the liens and security interests created, or to be created, for the benefit of Lender, and securing the Obligations under the Loan Agreement and the other Loan Documents, and all renewals, extensions, increases, supplements, amendments, modifications or replacements thereof.

3.    **Termination**.  At such time as the Obligations are satisfied and the Security Instrument is released or assigned of record, this Assignment and all of Lender's right, title and interest hereunder with respect to the Management Agreement shall terminate.

4.    **Estoppel**.  Each of Borrower and Manager represents and warrants that (a) the Management Agreement is in full force and effect and has not been modified, amended or assigned other than pursuant to this Assignment, (b) neither Borrower nor Manager is in default under any of the terms, covenants or provisions of the Management Agreement and neither Borrower nor Manager knows of any event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Management Agreement, (c) neither Borrower nor Manager has commenced any action or given or received any notice for the purpose of terminating the Management Agreement, and (d) the Management Fees and all other sums due and payable to the Manager under the Management Agreement as of the date hereof have been paid in full.

5.    **Agreement by Borrower and Manager**.  Borrower and Manager hereby agree that upon the occurrence of an Event of Default during the term of this Assignment, or upon the occurrence of any event which would entitle Lender to terminate, or cause the termination of, the Management Agreement in accordance with the terms of the Loan Documents (a) Manager shall, at the request of Lender, continue to perform all of Manager's obligations under the terms of the Management Agreement with respect to the Property, or (b) at the option of Lender exercised by written notice to Borrower and Manager, Borrower and Manager shall immediately terminate the Management Agreement and Manager shall transfer its responsibility for the management of the Property to a Qualified Manager selected by Borrower and approved by Lender.

6.    **Receipt of Management Fees**.  Borrower and Manager hereby agree that Manager shall not be entitled to receive any Management Fee or other fee, commission or other amount payable to Manager under the Management Agreement for and during any period of time that any Event of Default has occurred and is continuing; *provided, however*, that notwithstanding anything to the contrary (a) Manager shall not be obligated to return or refund to Lender any Management Fee or other fee, commission or other amount already received by Manager prior to the occurrence of the Event of Default, and to which Manager was entitled under this Assignment, and (b) in the event Borrower loses possession of the Property in connection with the exercise by Lender of its rights or remedies pursuant to this Assignment, the Note, the Security Instrument, the Loan Agreement or the other Loan Documents, Manager shall be entitled to collect any Management Fee or other fee, commission or other amount accrued but unpaid prior to the occurrence of the Event of Default, and to which Manager was entitled under this Assignment.

2

7. **Consent and Agreement by Manager.** Manager hereby acknowledges and consents to this Assignment and the terms and provisions of Section 3.1 of the Loan Agreement. Manager agrees that it will act in conformity with the provisions of this Assignment, the relevant provisions of the Loan Agreement and Lender's rights hereunder or otherwise related to the Management Agreement. In the event that the responsibility for the management of the Property is transferred from Manager in accordance with the provisions hereof, Manager shall, and hereby agrees to, fully cooperate in transferring its responsibility to a new management company and effectuate such transfer no later than thirty (30) days from the date the Management Agreement is terminated. Further, Manager hereby agrees (a) not to contest or impede the exercise by Lender of any right it has under or in connection with this Assignment and (b) that it shall, in the manner provided for in this Assignment, give at least thirty (30) days prior written notice to Lender of its intention to terminate the Management Agreement or otherwise discontinue its management of the Property, and (c) not to amend any of the provisions or terms of the Management Agreement without the prior consent of Lender. Subject to the terms of Section 6 hereof, Manager shall be entitled to collect from Borrower any Management Fee or other fee, commission or other amount accrued but unpaid prior to the transfer of the responsibility for the management of the Property to which Manager was entitled under this Assignment.

8. **Further Assurances.** Manager further agrees to (a) execute such affidavits and certificates as Lender shall require to further evidence the agreements herein contained, (b) on request from Lender, furnish Lender with copies of such information as Borrower is entitled to receive under the Management Agreement, and (c) cooperate with Lender's representative in any inspection of all or any portion of the Property. Manager hereby acknowledges that some, or all, permits, licenses and authorizations necessary for the use, operation and maintenance of the Property (collectively, the "*Permits*") may be held by, or on behalf of, the Manager. By executing this Agreement, Manager (i) agrees that it is holding or providing all such Permits for the benefit of Borrower and (ii) agrees that as security for the repayment of the Debt by Borrower in accordance with the Loan Agreement, to the extent permitted by applicable law, Manager hereby grants to Lender a security interest in and to the Permits. Moreover, Manager hereby agrees that, upon an Event of Default, it will assign the Permits to Lender if such Permits are assignable or otherwise continue to hold such Permits for the benefit of Lender until such time as Lender can obtain such Permits in its own name or the name of a nominee.

9. **Assignment of Proceeds.** Manager acknowledges that, as further security for the Note, (a) Borrower has executed and delivered to Lender an Assignment of Leases and Rents, dated as of the date hereof (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Assignment of Leases*"), assigning to Lender, among other things, all of Borrower's right, title and interest in and to all of the revenues of the Property, and (b) Borrower and Lender, among others, have entered into that certain Clearing Account Agreement of even date herewith (as the same may be amended, restated, replaced, supplemented, or otherwise modified from time to time, the "*Clearing Account Agreement*"), pursuant to which Borrower has agreed that any Rents, and other income and proceeds from the Property are to be deposited directly into an account of the Lender established pursuant to the Clearing Account Agreement. In the event of a conflict between the terms hereof, on the one hand, and the terms of the Loan Agreement, the Assignment of Leases, the Cash Clearing Account Agreement or any other Loan Document, on the other hand, the terms of the Loan Agreement, the Assignment of Leases, the Clearing Account Agreement or such other Loan Document, as applicable, shall govern and control.

10. **Manager Not Entitled to Rents.** Manager acknowledges and agrees that it is collecting and processing the Rents solely as the agent for Borrower and Manager has no right to, or title in, the Rents. Notwithstanding anything to the contrary in the Management Agreement, the Manager acknowledges and agrees that the Rents are the sole property of Borrower, encumbered by the lien of the Security Instrument and the other Loan Documents in favor of Lender. In any bankruptcy, insolvency or

3

similar proceeding the Manager, on behalf of itself and on behalf of any trustee acting on behalf of the Manager, waives any claim to the Rents other than as such Rents may be used to pay the fees and compensation of Manager pursuant to the terms and conditions of the Management Agreement, subject to the terms hereof.

11. **Governing Law**. (a) This Assignment shall be governed in accordance with the terms and provisions of <u>Section 10.3</u> of the Loan Agreement.

(b) WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "***PROCEEDING***"), BORROWER AND MANAGER EACH IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE COUNTY OF BELL AND STATE OF TEXAS, AND (B) WAIVES ANY OBJECTION WHICH IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER AND MANAGER EACH FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY TEXAS STATE OR UNITED STATES COURT SITTING IN THE COUNTY OF BELL MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER OR MANAGER AT THE ADDRESS INDICATED IN THIS AGREEMENT, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER OR MANAGER SHALL REFUSE TO ACCEPT DELIVERY, SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

12. **Notices**. All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "***Notice***") required, permitted or desired to be given hereunder shall be in writing and shall be sent by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or by reputable overnight courier, addressed to the party to be so notified at its address hereinafter set forth, or to such other addresses as such party may hereafter specify in accordance with the provisions of this <u>Section 12</u>. Any Notice shall be deemed to have been received: (a) three (3) days after the date such Notice is mailed, (b) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day), and (c) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

<table>
<tr><td>If to Lender:</td><td>Cantor Commercial Real Estate Lending, L.P.<br>110 East 59th Street, 6th Floor<br>New York, New York 10022<br>Attention: Legal Department<br>Facsimile No.: (212) 610-3623</td></tr>
<tr><td>with a copy to:</td><td>Duval & Stachenfeld LLP<br>555 Madison Avenue, 6th Floor<br>New York, New York 10022<br>Attention: Zachary Samton & File Manager<br>File No. 3302.0043</td></tr>
</table>

4

Facsimile No.: (212) 883-8883

| | |
|---|---|
| If to Borrower: | Omni Lion's Run, L.P.<br>1102 North Austin Avenue<br>Georgetown, Texas 78626<br>Attention: Gregory G. Hall<br>E-Mail: dhall@gregoryhallproperties.com |
| With a copy to: | Scott Heselmeyer<br>211 Round Rock Avenue<br>Round Rock, Texas 78664<br>Email: scott@dshlegal.net |
| If to Manager: | Gregory G. Hall<br>1102 North Austin Avenue<br>Georgetown, Texas 78626<br>Attention: Gregory G. Hall<br>E-Mail: dhall@gregoryhallproperties.com |
| With a copy to: | Scott Heselmeyer<br>211 Round Rock Avenue<br>Round Rock, Texas 78664<br>Email: scott@dshlegal.net |

Notwithstanding the foregoing, any party may change the address to which any such Notice is to be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Section 12. Notices shall be deemed to have been given on the date they are actually received; provided, however, that the inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery, shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel. Additionally, Notice from Lender may also be given by Servicer.

13. **Waiver Of Trial By Jury**. BORROWER AND MANAGER AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THIS ASSIGNMENT, THE NOTE, THE SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND MANAGER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND MANAGER.

14. **No Oral Change**. This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Lender, Borrower or Manager, but only by an agreement in writing signed by the party against

5

whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

15. **Number and Gender; Successors and Assigns**. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the Person or Persons referred to may require. This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Assignment. Neither Borrower nor Manager shall have the right to assign or transfer its rights or obligations under this Assignment without the prior written consent of Lender, and any attempted assignment without such consent shall be null and void

16. **Inapplicable Provisions**. If any provision of this Assignment is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Assignment such provision shall be fully severable and this Assignment shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Assignment, and the remaining provisions of this Assignment shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Assignment, unless such continued effectiveness of this Assignment, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

17. **Headings, Etc.** The headings and captions of various sections of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

18. **Duplicate Originals, Counterparts**. This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

19. **Secondary Market**. Lender may sell, transfer and deliver the Note and assign the Security Instrument, this Assignment and the other Loan Documents to one or more investors in the secondary mortgage market (*"Investors"*). In connection with such sale, Lender may retain or assign responsibility for servicing the Loan, including the Note, the Security Instrument, this Assignment and the other Loan Documents, or may delegate some or all of such responsibility and/or obligations to a servicer, including, but not limited to, any subservicer or master servicer, on behalf of the Investors. All references to Lender herein shall refer to and include any such servicer to the extent applicable.

20. **Lender's Reliance on Representations**. Borrower and Manager have executed this Assignment in order to induce Lender to accept the Security Instrument and the Loan Documents and with full knowledge that Lender shall rely upon the representations, warranties and agreements herein contained, and that but for this Assignment and the representations, warranties and agreements herein contained, Lender would not take such actions.

21. **Miscellaneous**. (a) Wherever pursuant to this Assignment (i) Lender exercises any right given to it to approve or disapprove any matter, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove such matter, all decisions that arrangements or terms are satisfactory or not

6

satisfactory to Lender and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)    Wherever pursuant to this Assignment it is provided that Borrower shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, legal fees and disbursements of Lender, whether incurred in connection with work performed by retained law firms, or the reimbursement for the expenses of in-house staff or otherwise.

22.    **Manager Acknowledgment**.    Manager hereby agrees that, notwithstanding any provision to the contrary set forth herein or in the Management Agreement, Manager shall comply, to the extent applicable, with the provisions of the Loan Agreement and the Clearing Account Agreement, final copies of which Manager acknowledges receiving.

23.    **Inconsistencies**.  In the event of any inconsistency between the terms and conditions hereof and the terms and conditions of the Management Agreement, the terms and conditions set forth in this Assignment shall govern.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

~#4846-7715-4568 v.2~
4823-9526-0705, v. 4

IN WITNESS WHEREOF, the undersigned have executed this Assignment of Management Agreement and Subordination of Management Fees as of the date and year first written above.

**BORROWER:**

OMNI LION'S RUN, L.P., a Texas limited partnership

By: Omni Lion Management, Inc., a Texas corporation, its general partner

By: _____
Name: Gregory G. Hall
Title: Director

[Signatures continue on following page]

**MANAGER:**

_____
Gregory Ø. Hall, d/b/a Hall Properties

**EXHIBIT "A"**
[MANAGEMENT AGREEMENT]

Exhibit A

# PROPERTY MANAGEMENT AGREEMENT

This Property Management Agreement (this "<u>Agreement</u>") is made and entered into as of the _____ day of November, 2004, by and between OMNI LION'S RUN, L.P., a Texas limited partnership ("<u>Owner</u>"), and GREGORY G. HALL, d/b/a Hall Properties ("<u>Manager</u>").

## WITNESSETH:

WHEREAS, Owner owns that certain property located at 701 East Central Texas Expressway, Harker Heights, Bell County, Texas, improved with one or more multi-family residential buildings (the "<u>Property</u>").

WHEREAS, Manager desires to manage the day-to-day operations of the Property and accept and assume such responsibilities attendant thereto, upon the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the foregoing and the covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1   APPOINTMENT

1.1   <u>Appointment</u>. Owner hereby engages, appoints and employs Manager as the manager of the Property with the responsibilities and obligations and upon the terms and conditions herein set forth, and Manager, by its execution hereof, does hereby accept such appointment.

1.2   <u>Term of Agreement</u>. The term of this Agreement shall begin on the date hereof (the "<u>Effective Date</u>"), and, unless sooner terminated or extended in accordance with the terms of this Agreement, shall expire at midnight immediately following 11:59 p.m. on the last day of the month in which occurs the twelfth (12th) month anniversary of the Effective Date. Notwithstanding the foregoing this Agreement shall automatically renew for successive one (1) year terms unless terminated in writing by Owner or Manager. Either party hereto may terminate this agreement upon not less that thirty (30) days written notice to the other party.

1.3   <u>Additional Properties</u>. No parcel of real property shall be subject to the terms of this Agreement unless listed on <u>Schedule A</u>.

## ARTICLE 2   MANAGER'S RESPONSIBILITIES

2.1   <u>Management</u>. Manager shall manage, operate, maintain and service the Property in a manner consistent with first class professional property management services and the overall investment strategy of Owner as such investment strategy is related to Manager by Owner from time to time. In no event shall the scope or quality of services provided by Manager hereunder be less than those generally performed by professional property managers of similar properties in the market where the Property is located. Manager shall make available to Owner the full

1212557.3 020

benefit of the judgment, experience, and advice of the members of Manager's organization with respect to the policies to be pursued by Owner in operating the Property, and will perform the services set forth herein and such other services as may reasonably be requested by Owner in managing, operating, maintaining and servicing the Property. Manager shall act as a fiduciary to Owner with respect to the Property and in this capacity, Manager shall deal at arm's length with all third parties and Manager shall serve Owner's interests at all times. Since the Property will be in accounts of separate clients of Prudential, it is important that the Property be treated equally, fairly and managed to the highest standards.

2.2　　Compliance with Laws. Subject to budgetary approval, and on behalf of Owner, Manager shall be responsible for full compliance with all present and future federal, state, county, municipal or other governmental laws, ordinances, regulations and orders relative to the leasing, management, use, operation, repair, maintenance or occupancy of the Property and with the rules, regulations or orders of any national or local Board of Fire Underwriters or other similar body, and Manager shall obtain or cause to be obtained, as applicable, all necessary certificates of occupancy, licenses and/or operating permits, if any, for the Property.

2.3　　Compliance with Mortgages, Etc. Subject to budgetary approval, Manager shall be responsible for full compliance with all terms and conditions contained in any ground lease, operating agreement, mortgage, deed of trust or other security instruments affecting the Property; provided, however, Manager shall not be personally liable for any payment or liability thereunder.

2.4　　Compliance with Leases and Other Agreements. Subject to budgetary approval, except as otherwise directed by Owner, Manager shall be responsible for full compliance with all terms and conditions contained in all leases, service contracts and other agreements required to be complied with by Owner with respect to the Property. Manager shall maintain all tenant files and any other records that relate to any tenant.

2.5　　Collection of Rents and Other Income. Manager shall use diligent efforts to collect all rents (including additional rental resulting from tenant participation in operating expenses, taxes, insurance and common area maintenance charges) and other charges, which may become due at any time from any tenant or from others in connection with the Property. Manager shall use diligent efforts to collect and identify any income due Owner from miscellaneous services provided to tenants or the public including, without limitation, parking income, tenant storage, and coin operated machines of all types, if any.

2.6　　Employees; Independent Contractor. Manager shall have in its employ at all times a sufficient number of capable employees to enable it to properly, adequately, safely and economically manage, operate, maintain, and account for the Property. All matters pertaining to the employment, supervision, compensation, promotion and discharge of such employees are the responsibility of Manager, which is in all respects the employer of such employees. Manager will negotiate with any union lawfully entitled to represent such employees and may execute in its own name, and not as agent for Owner, collective bargaining agreements or labor contracts resulting therefrom. Manager shall fully comply with all federal, state, county, municipal and

other governmental laws, ordinances, regulations and orders having to do with antidiscrimination, worker's compensation, employer's liability insurance, social security, unemployment insurance, hours of labor, wages, working conditions, immigration and all other employer-employee related subjects (including, without limitation, tax withholding and information reporting requirements) and shall not do any act, nor permit any act to be done that would constitute a violation of any or all of such laws, ordinances, regulations or orders.

## ARTICLE 3  COMPENSATION

3.1    Management Fee.  During the term hereof, Manager shall receive from Owner a management fee not to exceed four percent (4%) of the gross income Manager shall not be entitled to any compensation for performing Manager's responsibilities under this Agreement other than the Management Fee and reimbursable costs as described herein.

## ARTICLE 4  MISCELLANEOUS

4.1    No Partnership.  Nothing herein contained shall constitute or be construed to be or create a partnership or joint venture between Owner and Manager and Manager is and shall remain an independent contractor in connection herewith.

4.2    No Assignment.  This Agreement and all rights hereunder shall not be assignable by Manager without Owner's prior written consent, which consent may be withheld in Owner's sole discretion.  This Agreement is assignable by Owner and Owner shall be released from liability hereunder arising from and after such assignment.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns to the extent assignment is permitted hereunder.

4.3    Consent and Approvals.  Owner's consents or approvals may be given only by representatives of Owner from time to time designated in writing by Owner.  All such consents or approvals shall also be in writing.

4.4    Pronouns.  The pronouns used in this Agreement shall be understood and construed to apply whether the applicable person be an individual, partnership, corporation or other entity or an individual or individuals doing business under a firm or trade name.

4.5    Amendments.  Except as otherwise herein provided, any and all amendments, additions or deletions to this Agreement or any Schedules shall be null and void unless approved by the parties in writing.

4.6    Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

4.7    Representations.  Manager represents and warrants that it is fully qualified and licensed, to the extent required by law, to manage an retail complex and perform all obligations

assumed by Manager hereunder. Manager agrees to comply with all such laws now or hereafter in effect.

4.8    Complete Agreement. This Agreement and the Schedules attached hereto (which Schedules are incorporated herein by this reference for all purposes) supersede and take the place of any and all previous management agreements entered into between the parties hereto relating to the Property.

4.9    Time of the Essence. The parties agree that time is of the essence with respect to the deadlines set forth in, and the term of, this Agreement.

4.10    Governing Law. This Agreement shall be deemed to have been made and shall be governed by and construed and interpreted in accordance with the laws of the State where the Property is located. The parties hereto submit to personal jurisdiction in the State where the Property is located for the enforcement of the provisions of this Agreement and waive any and all rights to object to such jurisdiction for purposes of litigation to enforce this Agreement.

4.11    Non-Waiver. The failure of Owner or Manager to seek redress for violation or to insist upon the strict performance of any covenant, agreement, provision or condition of this Agreement, shall not constitute a waiver of the terms of such covenant, agreement, provision or condition, and Owner and Manager shall have all remedies provided herein and by applicable law with respect to any subsequent act which would have originally constituted a violation.

4.12    Sale of Property. Nothing herein contained shall be deemed to constitute Manager as the agent (exclusive or non-exclusive) with respect to the sale, mortgaging or other financing of the Property.

4.13    Attorneys' Fees. In the event of any controversy, claim or dispute between the parties hereto arising out of or relating to the Property or this Agreement or the breach hereof, the prevailing party shall be entitled to recover from the losing party, reasonable expenses, attorneys' fees and costs.

4.14    Liens. This Agreement shall not create an interest in real property and it shall not be recorded in the public records of any jurisdiction. Notwithstanding anything to the contrary contained herein, neither Manager nor any officer, partner, member, shareholder, representative or agent thereof shall be entitled to place, file or record a lien upon the Property on account of any sums alleged to be due and payable to Manager.

4.15    Counterparts. This Agreement may be executed in multiple counterparts, all of which, when taken together, shall constitute one and the same document.

IN WITNESS WHEREOF the parties hereto have executed this Property Management Agreement the date and year first above written.

Owner:

OMNI LION'S RUN, L.P., a Texas limited partnership

By:     OMNI G.P., L.L.C., a Texas limited liability company, general partner

By: _Gregory G. Hall_____
        Gregory G. Hall

Manager:

_Gregory G. Hall_____
GREGORY G. HALL, d/b/a Hall Properties

## EXHIBIT F

## Receivership Order

ORIGINAL

NO. 290,525-B

| | |
|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, AS TRUSTEE, FOR THE BENEFIT OF THE HOLDERS OF COMM 2015-CCRE22 MORTGAGE TRUST COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, § § § § § § § | IN THE DISTRICT COURT |
| Plaintiff, § § | |
| vs. § § | BELL COUNTY, TEXAS |
| OMNI LION'S RUN, L.P., § § | |
| Defendant. § | 46TH JUDICIAL DISTRICT |

## ORDER APPOINTING RECEIVER

CAME ON FOR CONSIDERATION the application for appointment of receiver (the "Application") filed by Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of COMM 2015-CCRE22 Mortgage Trust Commercial Mortgage Pass-Through Certificates, (the "**Lender**") against Omni Lion's Run, L.P. ("**Borrower**"). By its application, the Lender seeks the appointment of a receiver pursuant to the Deed of Trust on certain real property and related improvements described therein, commonly known as Lions Run Apartments, located at 701 East Central Texas Expressway, Harker Heights, Texas 76548 (the "Property"). The Court, having considered the application, finds that it has jurisdiction over all parties to this suit, that Borrower has received notice of the Application for Appointment of Receiver, that Borrower is in default of its obligations under the Note secured by the Deed of Trust, that the Property is probably insufficient to discharge the mortgage debt, and that the relief requested should be granted.

It is therefore

---

ORDER APPOINTING RECEIVER                                          PAGE 1



1.  ORDERED, ADJUDGED, and DECREED that Salvatore Thomas, a resident of
the State of Texas, a citizen of the United States, a qualified voter in the State of Texas, not a
party, attorney, or other person interested in this action, and otherwise qualified to serve under
the Texas Civil Practice & Remedies Code, is hereby appointed receiver of the Property (the
"**Receiver**").  Upon filing of a receiver's bond (the cost of which shall be paid by the
receivership estate) in the amount of $300.00 $5,000 conditioned as provided by law and approved by
this Court, together with filing the oath prescribed by law, the Receiver shall be authorized,
subject to control of this Court where such control is expressly reserved herein, to do any and all
acts necessary to the proper and lawful conduct of the receivership, which include but are not
limited to the acts described in the Deed of Trust and the following:

GA

1.  To take possession of and operate the Property, including but not limited to
the right to hire a management company, to open mail sent to Borrower, to
continue to use the existing trade name and other intellectual property, or change
the trade name of, the business located on the Property, and the right to change,
modify, or terminate existing contracts, leases and license agreements. Receiver is
specifically authorized to engage Tarantino Properties, Inc. ("Tarantino") to serve
as property manager for the Property and to pay Tarantino the customary fees and
expenses for its services;

2.  To take control of all bank accounts that are either (a) in the name of
Borrower or (b) under the control of Lender for the benefit of Borrower, (but
only to the extent that the same contain collected rents, security deposits, issues,
profits, and revenues of the Property that are for the account of the Lender) and,
or to seize such accounts and transfer or wire all funds in the accounts to a new
account set up by the Receiver, including using Borrower's tax identification
number for any lawful purpose, such as opening or maintaining bank accounts or
utility accounts for the Property;

3.  To take and maintain possession of all documents, books, records, papers,
and accounts relating to the Property, subject to Borrower's right to keep copies
of these documents;

4.  To apply the leases, rents, issues, profits, and revenues of the Property (i)
first to the  expenses, costs, and compensation, including reasonable attorneys'
fees, of the Receiver, Tarantino and the Lender, and the agents and employees of
each thereof and/or in accordance with Section 64.051 of the Texas Civil Practice
and Remedies Code; (ii) next to the operating expenses of the Property, which

shall include only reasonable and necessary expenses of operating the Property, including taxes, utilities, insurance, maintenance and repair costs (including immediate repair of potential life or safety risks), office expenses, and salaries of on-site personnel; and (iii) then to unpaid installments of indebtedness secured by the Deed of Trust;

5.      To develop and maintain a monthly operating budget, to be presented to the Lender or its agent for approval within thirty calendar days of the date of this Order Appointing Receiver, that will serve as the basis for monthly requisitions to fund operations;

6.      To account to the Court and to the Lender for all rents, issues, profits, and revenues of the Property collected by the Receiver;

7.      To conduct a marketing or leasing program with respect to the Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Property under such conditions as Lender may in its sole discretion deem appropriate or desirable and to pay the customary fees and expenses for its services;

8.      To lease, market and/or sell the Property to a third party, even if Borrower is in bankruptcy, including the right to sign any and all necessary documents to consummate any lease or sale of the Property including, but not limited to, any lease, contracts and/or deeds, and, if so requested by the Lender, to operate the Property pending nonjudicial foreclosure. Receiver is specifically authorized to hire a sales agent for the Property and to pay such sales agent the customary fees and expenses for its services;

9.      To investigate and determine whether it is in the best interest of the parties to sell the land in a private sale and if so, to negotiate and enter into a contract for the sale of the said estates; and

10.     To employ such counsel as is necessary to enable the Receiver to execute his powers hereunder and to pay such counsel a reasonable and customary rate.

11.     To collect and compromise demands and disputes affecting the Property or arising from the operations thereon;

12.     To enter into, assign as well as terminate contracts regarding the Property, provided, however, that before entering into any contracts that would cause the Receiver to incur charges of over $5,000, Receiver agrees to seek the prior written approval from Lender;

13.     To employ, as well as terminate the employ, of persons working at or with the Property;

14.     To take any and all actions necessary and helpful to settle any and all

insurance claims with respect to the Property;

15. To pay all appropriate real estate taxes, personal property taxes, or other taxes or assessments against the Property and take any and all action necessary and helpful to contest the valuation of the Property for real property tax purposes during the pendency of the receivership. Receiver shall have no responsibility for tax filings and payments regarding Borrower's federal and/or state income taxes, sales and use taxes or payroll taxes or other matters related to Borrower's employees, provided however, Receiver shall be responsible for filings regarding his personnel and the payroll taxes related thereto as well as any income taxes and filings regarding the fees paid to Receiver under this order;

16. To institute, prosecute, defend, compromise and/or intervene in or become a party to such actions or proceedings in state or federal courts which may in the Receiver's opinion be necessary for the protection, maintenance and preservation of the Property, for the carrying out of the terms of any order of this Court, affecting the Property, to collect rents and other amounts now or hereafter becoming due, to remove tenants or other persons or entities from the Property, and/or to defend against any action brought against the Receiver acting in such capacity;

17. Notwithstanding anything set forth hereinabove which may state or imply to the contrary, Receiver shall not be obligated to expend monies, or make improvements to, or to rehabilitate the Property, or to incur or pay any other expenses or bills in connection with his role as Receiver, except to the extent that monies for such matters are available either from operating revenues generated by the Property and/or funds provided by Wilmington Trust, National Association, as Trustee, for the Benefit of the Holders of COMM 2015-CCRE22 Mortgage Trust Commercial Mortgage Pass-Through Certificates; and

18. Except in the event of gross negligence, willful misconduct, or actions in violation of this Court's orders, the Receiver, Tarantino and the agents, employees, attorneys and contractors thereof have no personal liability for any obligations, claims, losses or damages arising from the this appointment or the performance of the Receiver's duties or the exercise of the Receiver's powers that may be incurred in the course of the receivership. Any liability incurred by, or recourse against, the Receiver other than for gross negligence, willful misconduct, or actions in violation of orders of the Court, will be limited to the assets (including the cash and cash equivalents) received and generated by the Property in the course of the receivership.

IT IS FURTHER ORDERED that money coming into the possession of the Receiver and not expended for any of the purposes authorized herein shall be held by the Receiver subject to such orders as this Court may hereafter issue.

IT IS FURTHER ORDERED that no lien, claim, or other security interest in the Property shall be affected by this order, nor shall the appointment impair the Lender's right or ability to proceed with any nonjudicial foreclosure of the Property or the sale of the Deed of Trust, Note, or other Loan Documents (as they are defined in the Application).

IT IS FURTHER ORDERED that, provided payments are made in accordance with this paragraph, Borrower shall be prohibited from cancelling or modifying any insurance policy currently covering the Property, except if requested by Receiver or Lender, and shall add Receiver and its designees as additional insureds on all insurance relating to the operation and management of the Property, in each case until the Receiver or Lender advises that replacement coverage has been obtained or to renew such policy at the expiration thereof. Borrower's obligation to maintain such policy shall continue until a nonjudicial foreclosure sale of the Property at which time such obligations of Lender and Borrower shall immediately cease without notice and without any refund or proration due to Lender.

IT IS FURTHER ORDERED that Borrower shall reasonably cooperate at no material, monetary cost or expense to Borrower with the Receiver in the performance of its obligations as Receiver and not interfere with or hinder in any way whatsoever the Receiver in the performance of the Receiver's duties herein described and in the performance of any duties incident thereto, and upon demand of Receiver, Borrower and any other person or entity in possession, custody, or control of the Property shall promptly turnover the Property, all cash collateral, all keys, all files, all security deposits, all rent and other sums relating to the Property, all accounts receivable

and accounts payable reports, all payroll records, all insurance policies and certificates, and all other records pertaining to the management of, or otherwise related to, the operation of the Property, in each case that are in the possession and control of Borrower or located at the Property in the form currently maintained, including electronically (on computer disks, tapes or other electronic data storage media), including information regarding software programs utilized by Borrower or its agents or representatives, thereto in order to permit Receiver or Receiver's agents access to all such information relating to the Property, and not otherwise in possession or control of Lender. If any of the foregoing property is not located at the Property or available from Lender on the date of this Order, Borrower shall, promptly during reasonable business hours, turnover same at the Property or otherwise, at Lender or Receiver's request and expense, in the form currently maintained. Borrower, at its expense, may retain copies of all information turned over to Receiver.

IT IS FURTHER ORDERED that this receivership shall continue in effect until further order of this Court. Immediately upon termination of the Receivership or removal of the Receiver, the Receiver shall turnover to Lender, all of the Property, excepting therefrom the monies received during the receivership. Upon Receiver's receipt of this Court's order terminating the receivership and discharging Receiver, Receiver shall turnover any and all remaining monies in the receivership estate to Lender.

SIGNED: __February 6,__ , 2017.

JUDGE PRESIDING



CERTIFIED COPY
DOCUMENT ATTACHED IS A
TRUE & CORRECT COPY
OF THE ORIGINAL ON FILE

FEB -7 2017

JOANNA STATON
DISTRICT CLERK - BELL CO., TEXAS
PAGE_____ DEPUTY

**ORDER APPOINTING RECEIVER**

## EXHIBIT G

## Oath of Receivership

| | | |
|---|---|---|
| **WILMINGTON TRUST, NATIONAL** | § | **IN THE DISTRICT COURT** |
| **ASSOCIATION, AS TRUSTEE, FOR THE** | § | |
| **BENEFIT OF THE HOLDERS OF COMM** | § | |
| **2015-CCRE22 MORTGAGE TRUST** | § | |
| **COMMERCIAL MORTGAGE PASS-** | § | |
| **THROUGH CERTIFICATES,** | § | |
| | § | **BELL COUNTY, TEXAS** |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **OMNI LION'S RUN, L.P.,** | § | |
| | § | **146th JUDICIAL DISTRICT** |
| **Defendant.** | § | |

## OATH OF RECEIVER

I, Salvatore Thomas, do solemnly swear that I will faithfully perform and discharge the duties of receiver in the above-styled and numbered cause and obey the orders of the Court issued in this cause.

_____

Salvatore Thomas

**STATE OF TEXAS**        §
                                        §
**COUNTY OF** Hallis        §

SUBSCRIBED AND SWORN TO BEFORE ME on the 9th day of February 2017, to certify which witness my hand and official seal.

[SEAL]

GLORIA ELIZABETH MACIAS
My Commission Expires
March 23, 2019

_____
Notary Public in and for the State of Texas