## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-60329-RBK |
| OMNI LION'S RUN, L.P. | § | |
| | § | |
| | § | |
| Debtor-in-Possession | § | CHAPTER 11 |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-60447-RBK |
| OMNI LOOKOUT RIDGE, L.P. | § | |
| | § | |
| | § | |
| | § | |
| Debtor-in-Possession | § | CHAPTER 11 |

### DEBTORS' DISCLOSURE STATEMENT UNDER 11 U.S.C. §1125
### FOR DEBTORS' JOINT PLAN OF REORGANIZATION
### DATED JUNE 26, 2017

**THE PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION FOR USE IN CONNECTION WITH THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OF REORGANIZATION DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT ARE NOT INTENDED AND SHOULD NOT IN ANY WAY BE CONSTRUED AS A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED HEREIN BE RELIED UPON FOR ANY PURPOSE BEFORE A CONDITIONAL DETERMINATION BY THE BANKRUPTCY COURT THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION.**

DATED:     June 26, 2017          Ron Satija
HAJJAR PETERS LLP
State Bar No. 24039158
3144 Bee Caves Rd
Austin, Texas 78746
512.637.4956
512.637.4958 (fax)
rsatija@legalstrategy.com

PROPOSED ATTORNEY FOR OMNI LOOKOUT RIDGE, L.P., AND OMNI LION'S RUN, L.P. DEBTORS IN POSSESSION

**TABLE OF CONTENTS**

I.   **INTRODUCTION** ................................................................................................. 1
   A.   Identity of the Debtor .................................................................... 1
   B.   General Information Concerning Disclosure Statement and Plan ............ 2
   C.   Disclaimers ................................................................................... 2
   D.   Answers to Commonly Asked Questions ........................................ 3
II.  **INFORMATION CONCERNING THE DEBTOR** .................................. 7
   A.   Overview of the Debtor ................................................................. 7
   B.   Management of the Debtor ............................................................. 7
   C.   Significant Transactions Prior to Bankruptcy ................................. 7
      1.   Purchase of Apartments; Financing ...................................... 7
      2.   Leasing .............................................................................. 7
      3.   Events Leading to Filing ..................................................... 7
   D.   Significant Events Since Filing Bankruptcy .................................... 8
      1.   In General ......................................................................... 8
      2.   Operations ......................................................................... 8
      3.   Lender's Proof of Claim ..................................................... 8
      4.   Legal Proceedings During Bankruptcy .................................. 9
   E.   Proposed Operations After Bankruptcy ........................................... 9
III. **FINANCIAL INFORMATION** .............................................................. 9
   A.   Pre-Bankruptcy ............................................................................ 9
   B.   Financial Results Since Filing Bankruptcy ..................................... 10
   C.   Estimated Future Income and Expenses .......................................... 10
IV.  **ANALYSIS AND VALUATION OF PROPERTY** .............................. 11
   A.   Real Property ................................................................................ 11
   B.   Cash, Financial Accounts, Accounts Receivable and other Intangible Property 11
   C.   Liquidation Value /Analysis ........................................................... 11
V.   **SUMMARY OF PLAN OF REORGANIZATION** .............................. 13
   A.   Analysis and Treatment of Claims ................................................. 13
      Class 1 – Administrative Expense Claims ................................... 14
      Class 2 – Allowed Priority Claims ............................................. 14
      Class 3 – Allowed Secured Mechanic's Lien Claims ................... 14
      Class 4 – Secured Claims of Taxing Authorities ......................... 15
      Class 5 – Secured Claim of City National Bank ("City") .............. 15
      Class 6 – Unsecured Tenant Deposit Claims from Apartment Leases ......... 15
      Class 7 – General Unsecured Claims ......................................... 15
      Class 8 – Subordinated Unsecured Claims ................................. 15
      Class 9 – Equity Interests in the Debtor. .................................... 16
      Class 10 – The Allowed Claim against Debtor ............................ 16
      Class 11 – Unsecured Tenant Deposit Claims ............................. 17
      Class 12 – Allowed Unsecured Claims over $500 ....................... 17
      Class 13 – Administrative Convenience Class ............................. 17
      Class 14 – Allowed Equity Interests in the Debtors ..................... 17
   B.   Feasibility of the Plan and Risk to Creditors .................................. 17
   C.   Remedies for Default .................................................................... 18
   D.   Claims Allowance Procedure ......................................................... 18
   E.   Assumption and Rejection of Leases and Contracts ....................... 19
   F.   Third Party Obligations ................................................................. 20

G. Effect of Confirmation of Plan ............................................................. 20
    1. Discharge ............................................................................. 20
    2. Injunction ............................................................................ 21
H. Retention of Jurisdiction ..................................................................... 21
I. Post-Confirmation Procedure ............................................................. 21
**VI.** **ALTERNATIVES TO THE DEBTOR'S PLAN** ................................. 21
A. Conversion .......................................................................................... 22
B. Dismissal ............................................................................................. 22
C. 363 Sale ............................................................................................... 22
**VII.** **RELATIONSHP OF DEBTOR WITH AFFILIATES** ...................... 22
**VIII.** **TAX CONSEQUENCES** ....................................................................... 22
**IX.** **PENDING AND POTENTIAL LITIGATION** ................................... 24
A. Avoidance Actions .............................................................................. 24
B. Other Litigation .................................................................................. 24
C. Preservation of Claims ....................................................................... 24
**X.** **SOLICITATION OF VOTES** ............................................................... 25

**Exhibits:**

Exhibit 1 – Debtor Lion's Run's First Monthly Operating Report
Exhibit 2 – Debtor Lion's Run's Pro Forma 3-Year Financial Projections
Exhibit 3 – Debtor Lookout Ridge's Pro Forma 3-Year Financial Projections
Exhibit 4A&B - Schedule of Creditors' Claims
Exhibit A - Amended Plan of Reorganization

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-60329-RBK |
| OMNI LION'S RUN, L.P. | § | |
| | § | |
| | § | |
| Debtor-in-Possession | § | CHAPTER 11 |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 17-60447-RBK |
| OMNI LOOKOUT RIDGE, L.P. | § | |
| | § | |
| | § | |
| Debtor-in-Possession | § | CHAPTER 11 |

### DEBTORS' AMENDED DISCLOSURE STATEMENT FOR
### DEBTORS' AMENDED PLAN OF REORGANIZATION
### DATED JUNE 26, 2017

### IMPORTANT

**THIS DISCLOSURE STATEMENT IS SUBMITTED TO ALL CREDITORS OF THE DEBTORS ENTITLED TO VOTE ON ACCEPTANCE OF THE PLAN OF REORGANIZATION HEREIN DESCRIBED AND CONTAINS INFORMATION THAT MAY AFFECT YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS INTENDED TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY THE BANKRUPTCY CODE AS TO THE DEBTO'S PLAN OF REORGANIZATION WHICH IS ATTACHED HERETO AS EXHIBIT A. ALL CREDITORS ARE URGED TO READ THE DISCLOSURESTATEMENT AND ATTACHMENTS WITH CARE AND IN THEIR ENTIRETY**

### I. INTRODUCTION

#### A.    Identity of the Debtors

Omni Lion's Run, L.P. ("OLR" or "Lion's Run") filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq* ("Code") on May 2, 2017.  Omni Lookout Ridge, L.P. ("LOR" or "Lookout Ridge") filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*

("Code") on June 6, 2017. Lion's Run and Lookout Ridge are both debtors in bankruptcy in their own cases filed in the United States Bankruptcy Court for the Western District of Texas, Waco Division ("Bankruptcy Court"). Together, they will be referred to as "Debtors." The Debtors have been operating as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108 since the bankruptcy filings. The Debtors are Texas limited partnerships that owns apartment complexes in Harker Heights, Texas, known as the Lion's Run Apartments and Lookout Ridge Apartments, respectively.

**B.      General Information Concerning Disclosure Statement and Plan**

The Debtors have promulgated and filed this Joint Disclosure Statement and a Joint Plan of Reorganization (which is attached hereto as <u>Exhibit A</u>) consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is to provide the maximum recovery to each Class of Claims in light of the assets and anticipated funds available for distribution to Creditors. The Debtors believe that the Plan permits the maximum possible recovery for all Creditors while facilitating the reorganization of the Debtors.

The Debtors submit this Disclosure Statement pursuant to 11 U.S.C. § 1125 and Rules 3016 and 3017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") to all Creditors of the Debtors for the purpose of disclosing that information which the Court has determined is material, important, and necessary for creditors and the members of the Debtors in order to arrive at an intelligent, reasonably, informed decision in exercising the right to vote for acceptance or rejection of the Debtors' Plan of Reorganization ("Plan").

This Disclosure Statement describes the reorganization of the Debtors contemplated under the Plan. However, it is not intended to replace a careful review and analysis of the Plan, including the specific treatment you, as a Creditor, will receive under the Plan (which is attached hereto as <u>Exhibit A</u>). It is submitted as an aid and supplement to your review of the Plan in an effort to explain the terms and implications of the Plan. Every effort has been made to explain various aspects of the Plan as it affects Creditors. If any questions arise, the Debtors urge you to contact the Debtors' counsel and every effort will be made to address your questions. You are, of course, also urged to consult with your own counsel.

A copy of the Debtors' proposed Plan of Reorganization ("Plan") is attached hereto as <u>Exhibit A</u>. Capitalized terms used herein, if not separately defined, have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules.

**C.      Disclaimers.**

**NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND 11 U.S.C. § 1125 AND NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTOR TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR SUBMITTED HEREWITH.**

**EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, NO REPRESENTATION CONCERNING THE DEBTORS, ITS ASSETS, PAST OR**

FUTURE OPERATIONS, OR CONCERNING THE PLAN IS AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN. ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS.

UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF.

NEITHER DELIVERY OF THE DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE PLAN ATTACHED HERETO SHOULD BE READ IN THEIR ENTIRETY PRIOR TO VOTING ON THE PLAN. FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT.

D.    **Answers to Commonly Asked Questions.**

As part of the Debtor's effort to inform Creditors regarding the Debtors' Plan and the Plan confirmation process, the following summary provides answers to various questions which are often asked by a party receiving a disclosure statement.

THE FOLLOWING SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN THE EVENT OF ANY INCONSISTENCY.

1.    **WHO ARE THE DEBTORS?**

Omni Lion's Run, L.P. d/b/a Lion's Run Apartments
Omni Lookout Ridge, L.P. d/b/a Lookout Ridge Apartments

2.    **HOW LONG HAVE THE DEBTORS BEEN IN CHAPTER 11?**

Lion's Run has been in bankruptcy since May 2, 2017.
Lookout Ridge has been in bankruptcy since June 6, 2017

3.    **WHAT IS CHAPTER 11?**

Chapter 11 is the business reorganization provision of the Bankruptcy Code. It permits a Debtor to submit a Plan of Reorganization providing for the sale, distribution or retention of its assets to be used for the repayment of its debts on terms it believes to be manageable.

## 4.      WHAT ARE THE DEBTORS ATTEMPTING TO DO IN CHAPTER 11?

The principal objective of a Chapter 11 case is confirmation (approval) of a plan of reorganization that enables a financially distressed debtor to restructure its debts and its assets. A plan of reorganization sets forth the means for treating impaired and unimpaired claims against a debtor. A claim is impaired under a plan of reorganization if the plan provides that such claim will not be repaid in full or that the legal, equitable, or contractual rights of the holder of such claim will be altered. A claim is unimpaired if it will be paid in full or the legal, equitable, or contractual rights of the holder of such claim are not altered by the plan of reorganization. A holder of an impaired claim generally is entitled to vote on a plan of reorganization if such claim has been allowed under Section 502 of the Bankruptcy Code.

## 5.      HAVE THE DEBTORS PROPOSED A PLAN OF REORGANIZATION?

Yes. The Debtors have filed a Joint Plan of Reorganization ("Plan") along with this Disclosure Statement. The Plan proposed by the Debtors is attached hereto as Exhibit A.

## 6.      IF THE PLAN OF REORGANIZATION GOVERNS HOW MY CLAIM IS TREATED, WHY AM I RECEIVING THIS DISCLOSURE STATEMENT?

The Bankruptcy Code requires that a debtor solicit acceptances and rejections of its proposed Plan before the Plan can be confirmed (approved) by the Bankruptcy Court. Before a Debtor can solicit acceptances of its Plan, the Bankruptcy Court must approve the Disclosure Statement and determine that the Disclosure Statement contains information adequate to allow creditors to make informed judgments about the Plan. After Bankruptcy Court approval of the Disclosure Statement, then the Disclosure Statement, the proposed Plan and a ballot are sent to the holders of claims. The creditors then have the opportunity to vote on the Plan.

## 7.      HAS THIS DISCLOSURE STATEMENT BEEN APPROVED BY THE COURT?

Yes. By order entered_____, the Bankruptcy Court approved this Disclosure Statement. Before a Plan of Reorganization can be sent to creditors for voting, the Bankruptcy Court must find that a debtor's Disclosure Statement contains information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition for the debtor's books and records to enable a hypothetical, reasonable investor typical of holders of claims of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan. The Bankruptcy Court's approval of the Disclosure Statement in this case does not constitute an endorsement of any of the information contained in either the Disclosure Statement or the Plan.

Likewise, although the Debtors have utilized information believed to be accurate in preparing this Disclosure Statement, neither the Debtors nor their counsel warrant the accuracy of the information contained in or relied upon in preparing this Disclosure Statement nor should the Disclosure Statement be construed to be any representation or warranty whatsoever, express, implied or otherwise, that the Plan is free from risk, that acceptance or confirmation of the Plan will result in a risk-free or assured restructuring of the debts of the Debtors, or that the projections or plans of the Debtors for payment will be realized.

**8. WHY IS CONFIRMATION OF THE PLAN OF REORGANIZATION IMPORTANT?**

Confirmation (approval) of the Plan by the Bankruptcy Court is necessary for the Debtors to provide the proposed payment to Creditors under the Plan. Unless the Plan is confirmed by the Bankruptcy Court, the Debtors are legally prohibited from paying you what has been proposed in the Plan.

**9. WHAT IS NECESSARY TO CONFIRM THE PLAN OF REORGANIZATION?**

At the hearing scheduled by the Bankruptcy Court for_____, 2017 at        : .m. (Central time), in the U.S. Bankruptcy Court, 800 Franklin Avenue, Waco, Texas 76701, the Bankruptcy Court will consider whether the Plan of Reorganization should be confirmed. Section 1129 of the Bankruptcy Code contains the requirements for confirmation of a Plan of Reorganization. YOUR VOTE IS IMPORTANT. In order for the Plan to be accepted by creditors, at least two-thirds in amount and more than one-half in number of the *voting creditors* in each class must affirmatively vote for the Plan. Even if all classes of claims accept the Plan, the Bankruptcy Court may refuse to confirm the Plan. The Bankruptcy Court must also find that the Plan complies with the applicable provisions of the Bankruptcy Code and that the proponent of the Plan has also complied with the Bankruptcy Code. The Bankruptcy Court must also find that the Plan has been proposed in good faith and not by any means forbidden by law. The Bankruptcy Court must find that the proponent of the Plan (here, the Debtors) has disclosed the identity and affiliation of the persons who will manage the Debtors after confirmation, that the appointment of such persons is consistent with the interest of creditors and equity security holders and with public policy, and that the identity and compensation of any insiders that will be employed or retained by the reorganized Debtors has been disclosed. The Bankruptcy Court must additionally find that each class of claims has either accepted the Plan or will receive at least as much as it would under a Chapter 7 liquidation. The Bankruptcy Code also provides for the treatment of certain priority claims. If any classes of claims are impaired under the Plan, the Court must find that at least one class of claims that is impaired has accepted the Plan without counting any votes by insiders. The Court must also find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further reorganization of the Debtors. Additionally, the Plan must provide for payment of fees to the United States Trustee.

In the event that the Plan is not accepted by all classes of claims or interest, the Debtors may attempt to obtain confirmation under what is known as "cram-down." To obtain confirmation by cram- down, in general, the Bankruptcy Court must find that the Plan does not discriminate unfairly and is fair and equitable with respect to each class of

claims or interests that is impaired by the Plan and has not accepted the Plan. The Code provides several options for a Plan to be "fair and equitable" to a secured creditor, which includes the secured creditor retaining its lien and receiving deferred cash payments at a market interest rate totaling either the value of the property securing the claim or the amount of the allowed claim as found by the Bankruptcy Court, whichever is less. With respect to a class of unsecured claims, the requirement that a Plan be "fair and equitable" requires that the holder of an unsecured claim be paid the allowed amount of its claim or that no junior interest receive or retain any property on account of its prior claim. In the event that the Plan is not accepted by all classes, notice is hereby given that the Debtors will seek to obtain confirmation of the Plan through "cram-down."

## 10.     ARE CREDITORS ENTITLED TO VOTE ON THE PLAN?

Yes, each impaired Creditor is entitled to vote on the Debtors' proposed Plan. If you are a Creditor, a ballot to be used for voting on the Plan has been distributed to you with this Disclosure Statement. If you lose your Ballot, you may request another one from Debtors' counsel. Instructions for completing and returning the Ballot are set forth on the Ballot and should be reviewed carefully.  IF YOU HOLD A CLAIM AGAINST BOTH DEBTORS, YOU MUST RETURN A BALLOT FOR EACH EACH CASE.

## 11.     HOW WILL THIS PLAN TREAT MY CLAIM?

People who are owed money by the Debtors hold what is known as a "claim." The Plan organizes claims into classes based upon the type of claim and the treatment which it will receive under the Plan. In order to determine how the Plan treats your claim, you must first determine which class covers your claim. To find the treatment of your claim, look in the Table of Contents to find the category which best describes your claim. Many creditors will hold what are known as unsecured claims.

## 12.     WHEN IS THE DEADLINE FOR RETURNING MY BALLOT?

The Bankruptcy Court has directed that, in order to be counted for voting purposes, ballots must be received by the Debtor no later than 5:00 p.m. (Mountain time), on___ _____, 2017 ("Voting Deadline"), at the following address:

PLAN BALLOTS-LION'S RUN/ LOOKOUT RIDGE
c/o Hajjar Peters LLP
Attn: Ron Satija
3144 Bee Caves Rd.
Austin, TX 78746

You may also vote by facsimile transmission by sending your ballot to PLAN BALLOTS LION'S RUN/LOOKOUT RIDGE c/o Hajjar Peters LLP Attn: Ron Satija, fax no. (512) 637-4958 so that it is received by the Voting Deadline or by sending a "pdf" file of your scanned ballot attached to an email addressed to rsatija@legalstrategy.com with the language "PLAN BALLOTS-LION'S RUN/LOOKOUT RIDGE" in the subject line.

**IT IS IMPORTANT THAT ALL CREDITORS VOTE ON THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO**

**CREDITORS. FOR THIS REASON THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE CREDITORS AND RECOMMENDS THAT ALL CREDITORS VOTE TO ACCEPT THE PLAN.**

## II. INFORMATION CONCERNING THE DEBTORS

**A. Overview of the Debtor**

The Debtors are Texas limited partnerships which own one apartment complex each along with associated tangible property such as office furniture and equipment, tools, and pool furniture. The Debtors do not engage in or own any other businesses.  Omni Lion's Run, L.P. owns Lion's Run Apartments, a 208-unit apartment community located at 701 E Central Texas Expy, Harker Heights, Bell County, Texas.  Omni Lookout Ridge, L.P. owns Lookout Ridge Apartments, a 143-unit apartment community located at 201 Lookout Ridge Blvd., Harker Heights, Bell County, Texas.

**B. Management of the Debtor**

The general partner of both Debtors is Omni GP LLC, which owns 1% of the Debtor.  The members of Omni GP LLC are Greg and Betty Hall.  Mr. Hall has guaranteed the debt of the principal lenders (defined below) of each of the two Debtors.  He may be referred to in this document as the "Guarantor" or "equity interest-holder."  He owns other businesses and land through other entities and is willing to contribute the funds to fund the Plan if the Debtors experience a shortfall in their income.

The Debtors have hired Brian Blaylock as the General Manager of both Apartment Complexes.  Mr. Blaylock brings significant experience in operations and finance from running large hospital entities for many years.

**C. Significant Transactions Prior to Bankruptcy**

1.  Lenders

Omni Lion's Run entered into a note with Cantor Commercial Real Estate Lending, L.P., on February 18, 2015, for $5,400,000.  The note was subsequently assigned to Comm 2015-CCRE22 E. Ctral Texas Expy LLC.

Omni Lookout Ridge entered into a note with Lehman Brothers Bank, FSB, on February 13, 2007, for $4,200,000.  The note was subsequently assigned to LB-UBS 2007-C2 Lookout Ridge Boulevard, LLC.

2.  Fire

On January 9, 2016, a fire damaged 24 units at Lookout Ridge.  These units were subsequently repaired but have not been returned to service as discussed below.

3.  Events Leading to Filing

Lion's Run was placed into receivership in February of 2017 after default to the lender and was set for foreclosure on May 2, 2017.  The reason for default was the Debtor's poor

management.  The Debtor's prior manager did not prioritize leasing and failed, despite direction from Mr. Hall, to pay the lender monthly and seek contribution from Mr. Hall for shortfall regarding other debts.

Lookout Ridge filed a previous bankruptcy case, Case No. 16-11048-tmd, in the Western District of Texas, Austin Division, on September 6, 2016, which was dismissed on March 27, 2017.  In part, the case was caused by the failure of the fire-damaged units to be returned to service.  The lender accepted the insurance proceeds and then refused to pay the contractor, Belfor.  Litigation ensued in a state court, and the lender was forced to escrow approximately $1.3 million to pay for Belfor's work in order to be allowed to foreclose its lien on the Apartment Complex.  Additionally, the Debtor's case was due to poor management.  The Debtor's manager did not prioritize leasing and failed, despite direction from Mr. Hall, to pay the lender monthly and seek contribution for shortfall regarding other debts.  The property was posted for foreclosure for June 6, 2017.

## D.    Significant Events since Filing Bankruptcy

### 1.    In General.

The Apartment Complexes are "single asset real estate" as defined by 11 U.S.C. § 101(51)(B) as "real property constituting a single property or project ... which generates substantially all of the gross income of a debtor." Pursuant to 11 U.S.C. § 362(d)(3), the automatic stay imposed on the lenders by the commencement of Debtors' cases would terminate unless Lion's Run files on or before July 31, 2017, and Lookout Ridge files before September 4, 2017, a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time or the Debtors commenced making interest payments to the lenders at the non-default contract rate of interest by those dates respectively. The Debtors have timely filed a Plan of Reorganization and have budgeted to begin making interest payments.

In the brief time that they have been in bankruptcy, the Debtors have been simultaneously working on multiple time-intensive tasks – working to formulate a Plan of Reorganization that would be palatable to creditors and confirmable by the Bankruptcy Court; complying with their multiple duties as debtors-in-possession; and continuing to explore and implement methods to make the Apartment Complexes more attractive to potential tenants.

### 2.    Operations

Since the bankruptcy filings, the Debtors have continued to own and operate the Apartment Complexes as debtors-in-possession except that the Lion's Run complex has been under the control of a Receiver appointed by a state court judge.  Such operations have included collecting rents and revenues from tenants of the Apartment Complexes, and paying post-petition operating expenses in the ordinary course of business.  The Debtors have recently hired a new general manager for both complexes, and the equity-interest holders are preparing to inject capital to pay down the debt and/or make improvements to the complexes.

### 3.    Legal Proceedings During Bankruptcy

#### a.    Cash Collateral

The lenders assert a security interest in the Debtors' rents and revenues from the Apartment Complexes, which may constitute "cash collateral" under the Bankruptcy Code which cannot be used by the Debtors without Bankruptcy Court approval or City consent. Accordingly, the Debtors have filed Motions to authorize use of cash collateral with the Bankruptcy Court.  The Lookout Ridge lender, LB-UBS 2007-C2 Lookout Ridge Boulevard, LLC, has authorized a minimal amount of cash collateral usage, and preliminary hearing has been scheduled on the Lookout Ridge motion for June 27, 2017.

  b. <u>Other Bankruptcy Proceedings of note</u>

A creditors meeting under §341 of the Bankruptcy Code has been scheduled for June 27, 2017, at which Debtors plan to appear and testify. No official Committee of Unsecured Creditors has been appointed in either case.

The Bar Date for government agencies' Claims in the Omni Lion's Run case, 17-60329, is October 29, 2017 ("the OLR government bar date") and the Bar Date for all other Claims is September 18, 2017 ("the OLR claims bar date").  The Bar Date for government agencies' Claims in the Omni Lookout Ridge case, 17-60447, is December 3, 2017 ("the OLR government bar date"), and the Bar Date for all other Claims is September 25, 2017 ("the OLR claims bar date").

**E.** **Proposed Operations after Bankruptcy**

The Reorganized Debtors will own the Apartment Complexes after their Plans are confirmed and pay their creditors as provided for in the Plan. The Reorganized Debtors will continue to improve operations with the dual goals of running the Apartment Complexes more cost-efficiently and increasing occupancy. The Reorganized Debtors will continue working toward their goal of maximum occupancy.  Given the projected increases in the U.S. Military budget and the Debtors' proximity to Ft. Hood, the largest military base in the U.S, the Debtors do not believe it is unrealistic for the Apartment Complex to incur an increase in occupancy to achieve profitability over its debt service when the commitment from the Debtors equity interest holders and the guarantor.

The Debtors have hired a new general manager who will run the Apartment Complexes more cost-efficiently.

In addition, the Reorganized Debtor intends to aggressively pursue the sale of the Apartment Complexes to pay off the lenders in full and other creditors under the Plan. The Reorganized Debtors will also have the right to refinance the Apartment Complex.

**III.** **<u>FINANCIAL INFORMATION</u>**

The financial information contained herein has been prepared by the Debtors internally with the assistance of its attorneys.

**A.** **Pre-Bankruptcy**

Lion's Run's Bankruptcy Schedules (which were filed with the Bankruptcy Court on June 2, 2017, and are available for review by interested parties) reflected assets of approximately $8,707,570.00 and liabilities of approximately $6,992,012.81 as of June 2, 2017.

Lookout Ridge's Bankruptcy Schedules (which were filed with the Bankruptcy Court on June 21, 2017, and are available for review by interested parties) reflected assets of approximately $5,985,845.61and liabilities of approximately $6,517,494.11 as of June 21, 2017.

**B      Financial Results since Filing Bankruptcy**

Lion's Run was filed on May 2, 2017. The Debtor has timely filed its first Monthly Operating Reports with the Bankruptcy Court for the months of May 2017. A copy of the Debtor's Monthly Operating Report for May 2017, is attached hereto as Exhibit 1. It reflects the operating results of the receiver who has been in control of the property from the filing of the case rather than of the Debtor's management.

Lookout Ridge was filed on June 6, 2017, and no Monthly Operating Report is yet due. In limited results since the new manager was hired, several new units were made ready for rental under the limited resources allowed by the current cash collateral agreement.

**C.     Estimated Future Income and Expenses**

Attached as Exhibits 2, 3, and 4 are pro forma financial projections for the next three years of Reorganized Debtor's operations on a cash basis. These financial projections also include the estimated payments to be made to creditors under the Debtor's proposed Plan of Reorganization. Exhibit 2 reflects the Lion's Run finances. Exhibit 3 projects the Lookout Ridge finances if Building 4 is granted a certificate of occupancy, and Exhibit 4 is if Building 4 does not come online as expected.

The pro formas as are based on assumptions including conservative leasing assumptions including no above market increases in rents. The pro formas do not include additional contributions by the Debtors' Guarantor and equity interest holders as necessary to fund payments to creditors as provided for in the Plan, which will be projected separately once the Guarantor's financial information is available. There is a current motion pending to allow release under certain confidentiality restrictions so as not to damage sale and refinance transactions that are underway. The Debtors have provided projections based on an income stream that is relatively certain and quantifiable.

THE DEBTORS' PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES WHICH WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT RISKS INCLUDING, AMONG OTHER THINGS, THOSE DESCRIBED HEREIN. CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD LOOKING STATEMENTS.

## IV.    ANALYSIS AND VALUATION OF PROPERTY

### A.    Real Property

The real property owned by Omni Lion's Run, L.P. as of the date of the bankruptcy filing is the 208-unit Apartment community located at 701 E Central Texas Expy, Harker Heights, TX 76548-7203, known as the Lion's Run Apartments.  In its Bankruptcy Schedules, the Debtor valued the Apartment Complex real property and improvements at $7.2 million. Based on an appraisal of the Apartment Complex conducted in January 2016 performed on behalf of Cantor Commercial Real Estate Lending, L.P., the Apartment Complex was valued at approximately $7.2 million for an "AS IS" Market Value.  A newer appraisal for the lender shows an AS IS market value of $5,350,000 as of March 9, 2017, and a $7.25 million Stabilized Market Value in just 6 months, which is in line with the Debtor's estimate of value.

The real property owned by Omni Lookout Ridge, L.P. as of the date of the bankruptcy filing is the 143-unit Apartment community located at 201Lookout Ridge Blvd., Harker Heights, Bell County, Texas, known as the Lookout Ridge Apartments.  In its Bankruptcy Schedules, the Debtor valued the Apartment Complex real property and improvements at $4.4 million based on an appraisal performed for the lender showing the stabilized value at $4.4 million as of December 2016.

### B.    Cash, Financial Accounts, Accounts Receivable and other Intangible Property

The following chart estimates the amount of cash, financial accounts and accounts receivable and other personal property of the Debtors as of the bankruptcy filing date and as of June 26, 2017:

1.  **Lion's Run:**

| Category | 5/2/17 | 6/26/17 |
| --- | --- | --- |
| Bank Accounts | $unknown | $28,677.14 |
| Accounts Receivable | $unknown | $unknown (collected) |
| Equipment/Furniture | $7570 | $7570 |

2.  **Lookout Ridge:**

| Category | 6/6/17 | 6/26/17 |
| --- | --- | --- |
| Bank Accounts | $300.70 | $10.532.56 |
| Accounts Receivable | $0 | $0 (collected) |
| Equipment/Furniture | $1000 | $1000 |

### C.    Liquidation Value/Analysis

One of the requirements to confirm a plan of reorganization is that creditors receive at least as much as they would under a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. This does not mean that the Debtor's assets will be liquidated. Rather, it is intended to compare the payments under the Debtor's proposed Plan to payment under a chapter 7 liquidation.

In a chapter 7 liquidation, a chapter 7 Trustee would be appointed to liquidate the Debtors' property and pay the claims of creditors. Property subject to liens would either be sold for enough to pay the liens or foreclosed upon by the creditor. In general, once the property was liquidated in a chapter 7, the claims would be paid in the following order:

1) First, creditors holding a valid lien on the property liquidated would be paid from any liquidation proceeds;

2) Second, expenses of the chapter 7 Trustee would be paid;

3) Third, expenses incurred during the chapter 11 case and allowed by the court would be paid;

4) Fourth, priority creditors would be paid; and

5) Fifth, any remaining funds would be divided pro-rata among the unsecured creditors.

The Debtors have prepared the following liquidation analysis as of June 26, 2017, which estimates the value that creditors of the Debtors would receive under chapter 7 liquidation.

| Lion's Run: Asset | Gross Value | Liquidation Value | Less Liens | Net Liquidation Value |
|---|---|---|---|---|
| Apartment Complex | $7,200,000.00 | $5,350,000.00[1] | $6,791,199.81 | 0 |
| Equipment/Furniture | $7,570 | $1,000 | $7,570[2] | 0 |
| Accounts Receivable | 0 | N/A | 0 | 0 |
| Bank Accounts | $28,677.14 | N/A | $28,677.14[3] | 0 |
| | | | | |
| Total | | | | 0 |

| | |
|---|---|
| Amount available for distribution to Administrative/ Priority Creditors | $0 |
| Amount available for distribution to unsecured creditors | $0 |

| Lookout Ridge: Asset | Gross Value | Liquidation Value | Less Liens | Net Liquidation Value |
|---|---|---|---|---|
| Apartment Complex | $4,400,000 | $3,000,000[1] | $6,395,358.50 | 0 |
| Equipment/Furniture | $1,000 | 1,000 | $1,000[2] | 0 |
| Accounts Receivable | 0 | N/A | 0 | 0 |
| Bank Accounts | $10,532.56 | N/A | $10,532.56[3] | 0 |
| | | | | |
| Total | | | | 0 |

| | |
|---|---|
| Amount available for distribution to Administrative/ Priority Creditors | $0 |
| Amount available for distribution to unsecured creditors | $0 |

In the event that the Debtors' bankruptcy cases were converted to a liquidation case under chapter 7, the lenders would likely be allowed to foreclose their liens on the Apartment Complexes and all other property of the debtor to which their liens attach, which includes all furniture and equipment, receivables, and bank accounts as well as the real estate. Under 11 U.S.C. §362(d)(3), the stay will lift in a single asset real estate case if, after 90 days, there is not a plan with a reasonable chance of success or if the chapter 7 Trustee is not making monthly interest payments to the lenders. If the case were converted to chapter 7, there would no longer be a possibility of a Plan of Reorganization. Therefore, the only way that the Trustee could avoid foreclosure would be if the Trustee operated the Apartment Complexes and the Bankruptcy Court allowed use of cash collateral to make interest payments to City. In the experience of Debtor's counsel, most chapter 7 Trustees are unlikely to assume the risk of operating a business (such as an Apartment Complex located in a distant city) which is encumbered by liens. Thus, a chapter 7 Trustee's only option would likely be to permit the lenders to foreclose on the Apartment Complexes, which would in all likelihood result in no recovery for any creditors other than the lenders.

On the other hand, if the Debtors' Plan is confirmed, the Reorganized Debtors will be allowed to continue to operate the Apartment Complexes and proceed to repay their creditors from operations and additional contributions from the Debtors' owners (or sale or refinancing of the Apartment Complex with enough time). Under the Plan, the assets of the Debtors should be sufficient to pay all creditors. Accordingly, the Debtors believe that more will be recovered by creditors under the Debtors' proposed Plan of Reorganization than a liquidation under chapter 7 of the Bankruptcy Code.

[1] This value presumes that in chapter 7, the lenders would immediately and successfully move the Bankruptcy Court for relief from stay to foreclose their liens on the Apartment Complexes, or that the chapter 7 Trustee would be forced to pursue a fire-sale of the Apartment Complexes at very distressed price, since the Trustee would have no source of funds to operate and maintain the Apartment Complex without the use of the lenders' cash collateral.

[2] The lenders assert a lien on equipment and furniture owned by the Debtors.

[3] The lenders have asserted a lien on the cash in the Debtor's bank accounts derived from rental income on the Apartment Complexes as cash collateral. If these bankruptcy cases are converted to chapter 7, it is likely that the lenders would demand the remaining amount of cash derived from rents in the Debtors' bank accounts as its collateral.

## V.    SUMMARY OF PLAN OF REORGANIZATION

### A.    Analysis and Treatment of Claims.

Overview of the Plan

In general, the Debtors' Plan proposes to pay all Allowed Claims of creditors in full in cash. Such payments to creditors will be made over time from operations and from additional contributions from the Debtors' owners, or upon sale of the Apartment Complexes. Their primary means for paying creditors involve: (i) increasing income by leasing the remaining vacant spaces in the Apartment Complex to create additional sources of revenue; (ii) decreasing expenses by improving operations; (iii) negotiating cash infusions from the Debtors' Owners/the Guarantor; and (iv) marketing the Apartment Complex for sale. To increase the confidence of creditors with respect to the feasibility of Debtor's proposed Plan, the Guarantor will commit to contribute additional funds to the extent any shortfall exists in funds from the Debtors' operations to pay all creditors as provided for in the Plan.

The Lion's Run plan seeks to reinstate the lender's claim and pay as previously agreed. Other secured creditors with allowed claims and valid liens, primarily tax creditors, will be paid in full with interest over a five-year period commencing on the Effective date of the Plan, and retain their liens until paid.

The Lookout Ridge plan seeks to modify the lender's claim and pay interest-only for thirty-six months.  Secured tax creditors will be paid in full with interest over a five-year period commencing on the Effective date of the Plan, and retain their liens until paid. Belfor falls into its own class and will either be paid from the proceeds of a lawsuit, as described below, or by the Debtor over two years with interest.

Unsecured creditors will be paid the full principal amount of their claims over a three-year period commencing on the Effective date of the Plan. However, the Reorganized Debtors will also make efforts to sell the Apartment Complex and pay off all creditors as provided for in the Plan – which if successful will result in payment to creditors quicker than five years. After the Plan confirmation, the Reorganized Debtors will continue to own the Apartment Complexes, and will retain the right to sell the Apartment Complexes and will pay all creditors as provided under the Plan.

**Class 1-Administrative Expense Claims**

Administrative claims consist of expenses incurred during the chapter 11 case, which are approved by the Bankruptcy Court and expenses incurred in operating the Debtor's business. Most administrative expense claims consist of claims by professionals employed by the Debtor in the bankruptcy case, which must be approved by the Bankruptcy Court. Other administrative claims are claims arising post-petition which may have not been paid. The Debtor has paid and intends to continue to pay normal post-petition operating expenses as they become due in the ordinary course of business. The Administrative Claims of which Debtor is aware at this time include its bankruptcy counsel, as follows:

| Name | Retainer[4] | Estimated Fees as of June 26, 2017 |
|------|------------|-----------------------------------|
| Hajjar Peters LLP | $7,500 per case | $45,290.00 |

No Administrative Expense Claims (other than U.S. Trustee fees) shall be allowed except pursuant to Court order. Any application for allowance of an administrative expense claim shall be filed within 60 days after the Effective Date or shall be barred.

Under the proposed Plan, unless otherwise agreed, each holder of an Administrative Claim shall be paid in full by the Reorganized Debtors on the Effective Date of the Plan or on the date that a final order is entered approving the Administrative Expense Claim. To the extent that the cash of the Reorganized Debtors is not sufficient to pay allowed claims in this class, the Reorganized Debtors' limited partners will contribute an amount to the Reorganized Debtor sufficient to make such payment to this class.

Class 1 is not impaired.

**Class 2 Claims - Allowed Priority Claims against Omni Lion's Run.** The only current claim in this class is the priority claim of the Internal Revenue Service, which shall be paid in full, with interest at 3.0% per year, in equal monthly installments sufficient to fully amortize the balance of each of those Claims over a period beginning on the Effective Date and ending on May 1, 2022. Federal taxes for years 2017 forward will be paid when due. Class 2 is not Impaired.

**Class 3 Claims - Allowed Priority Claims against Omni Lookout Ridge.** There are two current claims in this class. First is the priority claim of the Internal Revenue Service, which shall be paid in full, with interest at 3.0% per year, in equal monthly installments sufficient to fully amortize the balance of each of those Claims over a period beginning on the Effective Date and ending on June 5, 2022. Federal taxes for years 2017 forward will be paid when due. Second is the Claim of the Texas Workforce Commission, in the amount of $1,386.37 which shall be paid in full on the Effective Date. Class 3 is not Impaired.

**Class 4 Claims -The Allowed Secured Ad Valorem Tax Claims of Omni Lion's Run.**
The Allowed Class 5 Claims shall be paid in full, as follows: (1) on the Effective Date, the Debtor
will pay the amount it has escrowed for ad valorem taxes, to be applied first to the 2016 taxes with
the balance, if any, of that payment to be applied to the 2017 taxes, and (2) the balance of the
Allowed Claims will be paid in full, with interest at 12.0% per year, in equal monthly installments
sufficient to fully amortize the balance of each of those Claims over a period beginning on the
Effective Date and ending on May 1, 2022. Payments will begin one month after the Effective Date.
Ad valorem taxes for the years 2018 forward will be paid when due (on January 31st of the following
year). The Class 5 Claimant shall retain its Lien on the Apartment Complex and the Debtor's
business personal property to secure its Allowed Claims until paid in full.  Class 5 is not Impaired.

**Class 5 Claims – Allowed Secured Ad Valorem Tax Claims of Omni Lookout Ridge.**
The Allowed Class 5 Claims shall be paid in full, as follows: (1) on the Effective Date, the Debtor
will pay the amount it has escrowed for ad valorem taxes, to be applied first to the 2016 taxes with
the balance, if any, of that payment to be applied to the 2017 taxes, and (2) the balance of the
Allowed Claims will be paid in full, with interest at 12.0% per year, in equal monthly installments
sufficient to fully amortize the balance of each of those Claims over a period beginning on the
Effective Date and ending on June 5, 2022. Payments will begin one month after the Effective Date.
Ad valorem taxes for the years 2018 forward will be paid when due (on January 31st of the following
year). The Class 5 Claimant shall retain its Lien on the Apartment Complex and the Debtor's
business personal property to secure its Allowed Claims until paid in full.  Class 5 is not Impaired.

**Class 6 Claim – The Allowed Secured Claims of IRS against Omni Lion's Run.**
The Allowed Class 6 Claims shall be paid in full, as follows:  the claim shall accrue interest at the
rate of 3.0% per annum (the rate required under 11 U.S.C. § 511), and be paid in full in sixty (60)
equal monthly payments of principal and interest, beginning thirty (30) days following the entry
of the Confirmation Order.  Claim 6 is impaired.

**Class 7 Claim - The Allowed Secured Claims of IRS against Omni Lookout Ridge.**
The Allowed Class 7 Claims shall be paid in full, as follows:  the claim shall accrue interest at the
rate of 3.0% per annum (the rate required under 11 U.S.C. § 511), and be paid in full in sixty (60)
equal monthly payments of principal and interest, beginning thirty (30) days following the entry of
the Confirmation Order.  Claim 7 is impaired.

**Class 8 Claim – Allowed Secured Claim of LNR against Omni Lion's Run.** The Allowed
Class 8 Secured Claim shall be reinstated through the plan.  The Debtor will cure the prepetition
default, compensate the lender, Comm 2015-CCRE22 E. Ctral Texas Expy LLC, for any damages
incurred as a result of a reasonable reliance on the acceleration of the obligation, compensate the
lender for any actual pecuniary loss arising from the failure to perform a non-monetary obligation.
The plan shall not otherwise alter the legal, equitable or contractual rights of the lender. The Debtor
shall make interest-only payments at the default rate for 3 months after the effective date and then
shall begin regular monthly, non-default payments beginning in the fourth month after the effective
date, along with an amount sufficient to amortize the arrearages within three years.  To the extent
that the cash flow of the Reorganized Debtor is not sufficient to pay Allowed Claims in this class,
the Guarantor will contribute an amount to the Reorganized Debtor sufficient to make such payment
to this class as provided in the Plan.  By the claim deadline, the lender shall file a claim enumerating
its claims for damages incurred as a result of a reasonable reliance on the acceleration of the

obligation and any actual pecuniary loss arising from the failure to perform a non-monetary obligation.  The Debtor shall treat the claim Class 8 is not impaired.

**Class 9 Claim - Allowed Secured Claim of LNR against Omni Lookout Ridge.**
Under the Plan, LNR's Claims will be treated as follows. The note of LB-UBS 2007-C2 Lookout Ridge Boulevard, LLC, ("LOR Lender") will be extended and modified into a modified note ("Modified Note") payable to the LOR Lender. The original principal balance of the Modified Note shall consist of (i) the unpaid principal balance of the original note and any unpaid accrued interest at the nondefault contract rate of the original note as of the Petition Date of June 6, 2017; (ii) any accrued but unpaid interest on the original note at the non-default contract rate of the original note between the Petition Date of June 6, 2017, and the Effective Date of the Plan; and
(iii) any fees and expenses of LNR; less all payments made by the Debtor to LNR during the bankruptcy case and prior to the Effective Date, including payments made by the Debtor under cash collateral orders. The Modified Note to lender will be payable as follows: (i) 36 monthly installments of interest on the unpaid principal balance of the Modified Note at six point one-six percent (6.16%) per annum (or such interest rate determined by the Bankruptcy Court as necessary to satisfy 11 U.S.C. §1129(b)(2)(A) of the Code), and (ii) the principal amortized over thirty
(30) years.  Any remaining outstanding principal and any unpaid interest will mature and be due in full three years after the Effective Date. The first monthly payment of principal and interest under the Modified Note shall be made on the Effective Date and each month thereafter; provided, in the event of a dispute between the Debtor and LNR regarding the amount of the Modified Note or documentation evidencing the Modified Note or collateral for the Modified Note, the first monthly payment of the principal and interest under the Modified Note will not be due until the dispute is resolved by final order of the Bankruptcy Court. The Modified Note may be prepaid at any time without any pre-payment penalty, charges or fees of any kind. Lender will retain its lien on all the collateral currently securing the original note to secure the Modified Note until the Modified Note is paid in full. To the extent that the cash flow of the Reorganized Debtor is not sufficient to pay the monthly payments of principal and interest on the Modified Note, the Guarantor will contribute an amount to the Reorganized Debtor sufficient to make such payment.  In the event that the lender prevails against Belfor in its lawsuit described below in Class 10, the insurance proceeds in escrow shall be credited to the principal of the Modified Note. In the event of sale of the Apartment Complex prior to the maturity of the Modified Note, lender will be paid in full from the sale proceeds in the amount of the unpaid principal balance of the Modified Note together with accrued and unpaid interest at the rate of six point one-six percent (6.16%) per annum (or such interest rate determined by the Bankruptcy Court as necessary to satisfy §1129(b)(2)(A) of the Code) at the time of payment, with no pre-payment penalty, charges or fees of any kind. Upon payment of lender in full as provided in the Plan, all of lender's liens, mortgages, security interests and guaranties shall be deemed extinguished and released, and lender shall promptly execute and deliver recordable releases of its liens, mortgages and security interests. Class 9 is impaired.

**Class 10 Claim – The Allowed Claim against Debtor Lookout Ridge of Belfor Property Restoration.**  The Allowed Class 10 Claim shall be determined and paid per the outcome of its claims in Cause No. 292,080 in Bell County District Court, Belfor USA Group v. Omni Lookout Ridge and LB-UBS 2007-C2 Lookout Ridge Boulevard, LLC ("Belfor suit"), in which Belfor Property Restoration and the Debtor, as Plaintiffs, seek to have approximately $1.1 million in insurance proceeds held by LNR turned over to Belfor for work done by Belfor on the Apartment Complex. Belfor is secured by a mechanic's lien. The Debtor shall negotiate and pay an amount sufficient to Belfor to adequately protect its interest until the lawsuit is concluded. As soon as practicable, Belfor shall perform any services necessary to issue a certificate of occupancy for the

Debtor's Building 4. Should Belfor not prevail in its lawsuit against the lender, the Debtor will pay Belfor's invoices over two years at 5% interest.  Should there be any shortfall in payments from the Debtor's budget, the Guarantor shall make payments in the amount of the difference.  Class 10 is Impaired.

**Class 11 Claims - Unsecured Tenant Deposit Claims from Apartment Leases**
Class 11 consists of unsecured claims for deposits arising from the execution of leases by Debtor as landlord and all tenants at both Apartment Complexes. The Debtor is assuming all leases with all tenants at the Apartment Complexes. The security deposits of the tenants who are occupying space according to their leases will be returned or retained pursuant to the terms of their individual leases. The Plan will not alter the legal, equitable, or contractual rights of the tenants under Class 11 to their deposits. Class 11 is not impaired, is deemed to have accepted the Plan, and is not entitled to vote on the Plan.

**Class 12 Claims – Allowed Unsecured Claims over $500, the holders of which do not elect to be included in Class 13.** Each of the holders of Class 12 Claims will be paid their claims within three years in pro-rata payments at regular intervals no less often than quarterly at 5% interest. The Debtor may, at its discretion, pre-pay any claim without penalty.  Class 12 is Impaired.

**Class 13 Claims – Administrative Convenience Class: Allowed Unsecured Claims of $500 or less, including each Allowed Unsecured Claim over $500 that the holder elects to reduce to $500.**  The Class 13 Claims will be paid in full in cash on the date one month after the Effective Date. Class 13 is not Impaired.

**Class 14 Interests – Allowed Equity Interests in the Debtors.** The Interests held by the equity interest holders of the Debtors shall be maintained in exchange for the Guarantor's contributions as described in the plan.  The Interest Holders will receive no distributions unless and until all other payments under the Plan have been made in full and all creditors have either been paid in full or as agreed. Class 14 is Impaired.

**B.      Feasibility of the Plan and Risk to Creditors**

Feasibility of the plan and risk to creditors measure the likelihood that creditors will receive the payments proposed to them under the Plan.

In general, the Plan contemplates three types of payments: payments which will be made at or near the Effective Date of the Plan, payments to the secured lenders, which will be made monthly with a balloon payment at the end of a certain period of time; and payments made to other creditors to pay their Allowed Claims over a discrete period of time. The pro formas contained in Exhibits 2, 3, and 4 include the Debtors' estimates of the types of payments to be made under the proposed Plan. Further, under the proposed Plan, the Reorganized Debtors will make efforts to sell the Apartment Complexes and pay off all creditors in full as provided for under the Plan earlier than the payout.

The Plan proposes to pay all creditors the amount of their Allowed Claims in full in cash. It also seems clear that these same creditors, except for the lenders, will most likely receive nothing outside bankruptcy or in a chapter 7 bankruptcy. Therefore, there is very little risk to creditors in giving Debtor a chance to make the Apartment Complex and the Plan "work" by voting for the Plan. Even if the Plan failed, creditors should be in no worse shape than they are at this time.

In addition, the feasibility of the Plan is significantly enhanced and the risk to all creditors significantly decreased by the commitment by the Reorganized Debtors' limited partner to contribute funds necessary to pay all creditors in full as provided in the Plan in the event that cash flow from the Apartment Complexes is insufficient.

The likelihood of all creditors being paid is also enhanced by the Plan, as the Reorganized Debtors are given the time to pursue the sale or refinancing of the Apartment Complex, the proceeds of which will be used to pay creditors.

## C.    Remedies for Default

In the event of default by the Reorganized Debtors under the Plan, creditors may exercise any rights granted to them under documents executed in connection with the Plan or any rights available to creditors under applicable non-bankruptcy law. Notwithstanding any other provision, any creditor alleging a default must give the Reorganized Debtors 30 days' notice and an opportunity to cure before exercising any rights available upon default.

In the event of a default by a creditor, the Debtors may enforce the Plan as a contract in a court of competent jurisdiction. The Reorganized Debtors may escrow payments to any creditor which defaults under the Plan until the default is cured. The Reorganized Debtors shall give the creditor 30 days' notice and an opportunity to cure before exercising this provision.

Conversion to chapter 7 is available as a remedy for default in the event that the Reorganized Debtors fail to substantially consummate the Plan. However, once substantial consummation occurs, conversion to chapter 7 is no longer available as a remedy for default. When the Plan is confirmed and is substantially consummated, the assets of the Debtors will revest in the Reorganized Debtors subject only to the liens and claims provided for under the Plan. In the event that the Debtors' case was converted to one under chapter 7 after consummation of the Plan, these assets would not revest in the bankruptcy estate.

## D.    Claims Allowance Procedure

No Administrative Expense Claims shall be allowed except pursuant to Court Order. Any application for allowance of an Administrative Expense Claim shall be filed within 60 days after the Effective Date or shall be barred. Any claims for reimbursement of fees and expenses pursuant to 11 U.S.C. § 506(b) shall be filed within 30 days after the Effective Date or shall be barred.

Any claims for rejection of an executory contract or unexpired lease shall be filed within 30 days after the Effective Date or the date set forth in the order rejecting the lease or contract, whichever is less. Cure claims on assumed executory contracts and unexpired leases shall be filed within 30 days after the Effective Date if they differ from the amount set forth by the Debtors herein, or shall be barred.

The Debtors or Reorganized Debtors may file an objection to a claim on or before the later of 60 days from the Effective Date under the Plan or 60 days after such claim is filed. Attached as Exhibit 4A & 4B is a list of all creditors and the amount Debtors have scheduled for each of their claims, the amount of each Creditor's Proof of Claim (if filed) and whether Debtors plan at this time to dispute such claim.[5]

A claim to which an objection has been made shall at the request of the Creditor be estimated by the Court for the purposes of voting on the Plan.

**E. Assumption and Rejection of Leases and Contracts**

Under the Bankruptcy Code, the Debtors must assume or reject any unexpired leases or executory contracts.

The following chart sets out the executory contracts and unexpired leases which the Debtors intend to assume and the amount necessary to cure any arrearage according to the Debtor. The Plan shall constitute a motion to assume the following contracts and leases:

<u>**ASSUMED CONTRACTS/LEASES**</u>

| Party Name | Type of Contract/Lease | Amount to Cure Arrearage |
|---|---|---|
| All Apartment Complex Tenants | Apartment Complex Leases | $0.00 |
| TOTAL | | $0 |

[5] The general Bar Date (deadline) for filing Proofs of Claim in this bankruptcy case has not yet passed. The Debtors anticipate additional claims will be filed after the Bar Date and may also object to claims not listed as disputed if the Proof of Claim is not valid or significantly in excess of the amount reflected in its books and records.

The Debtors reserve the right to reject any executory contracts and unexpired leases (including those listed above) by filing a notice with the Bankruptcy Court within 7 days prior to the Confirmation Hearing on the Plan.

Under the Plan, the Reorganized Debtors will cure and pay the above amount of arrearages on assumed contracts and leases in 60 equal monthly payments beginning 30 days after the Effective Date, unless otherwise agreed. If a dispute exists between the Debtors and party to an executory contract as to the amount necessary to cure defaults, then the Reorganized Debtors will begin to cure and pay such arrearages within 30 days after entry of a final order of the Bankruptcy Court determining such arrearage. In the event that the cash on hand of the Reorganized Debtors is insufficient to cure such arrearages, the Reorganized Debtors' limited partners will contribute an amount to the Reorganized Debtors sufficient to make such payments.

Under no circumstances shall the Partnership Agreements governing the Debtors be deemed executory contracts which are rejected under this Plan or otherwise; to the extent such Partnership Agreements constitutes executory contracts, they shall be deemed to be assumed by the Reorganized Debtors.

Following is a list of unexpired leases and executory contracts that the Debtors intend to reject. The Plan shall constitute a motion to reject the following contracts and leases:

## REJECTED CONTRACTS/LEASES

**Party Name**                                    **Type of Contract/Lease**

The Debtors reserve the right to assume any executory contracts and unexpired leases (including those listed as being rejected as set forth above) by filing a notice with the Bankruptcy Court within 5 days prior to the Confirmation Hearing on the Plan.

Any executory contracts and unexpired leases of the Debtor that are not expressly rejected shall be assumed under the Plan.

## F.    Third Party Obligations

The lenders have received personal guarantees from Mr. Gregory Hall (the limited partner of both Debtors and guarantor of the secured debt to the lenders) of the loan made to the Debtors by the lenders. To the extent that any third party is jointly liable with the Debtors to a creditor on a Claim, whether by contract, by guaranty, or by operation of law, under the Plan, such third party obligation shall remain in force with respect to the Claim of the creditor as modified by this Plan, but not otherwise. All guarantees and other obligations of third parties shall be deemed modified to reflect the restructuring of the Claims under the Plan, including the personal guarantees of Mr. Hall which will guaranty the Modified Note provided to the Lookout Ridge lender under the Plan to the same extent that he guaranteed the Original Note. If the Plan is confirmed, a creditor may not enforce liability under a guaranty, contract, or by operation of law against a third party unless the Reorganized Debtor defaults under the Plan. In the event of default, only the amount owing under the Plan shall be recoverable from any guarantor or third party.

## G.    Effect of Confirmation of Plan

### 1.    Discharge

Pursuant to the Plan and the Confirmation Order, and except as expressly provided for in the Plan, the rights afforded in the Plan and the treatment of all Claims shall be in exchange for and in complete satisfaction, discharge, and release of all claims of any nature whatsoever against the Debtors and any of the Debtors' property; and, except as otherwise expressly provided in the Plan or the Confirmation Order, upon the Effective Date, the Debtors shall be deemed discharged and released from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim or interest based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt or interest has accepted the Plan. Except as expressly provided in the Plan, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors at any time obtained to the extent it relates to a Claim discharged, and shall operate as an injunction against the prosecution of any action against the Debtors, or their property, to the extent it relates to a Claim discharged.

2.    Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order, and as provided in section 1141 of the Bankruptcy Code, from and after the Confirmation Date, all Creditors and holders of Claims against the Debtors that are discharged pursuant to the Plan or the Bankruptcy Code are permanently restrained and enjoined from taking any of the following actions against the Estate, the Debtors, the Reorganized Debtor or any of their property on account of any such Claims, debts, liabilities or rights: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, debt or liability against any Debtor, the Reorganized Debtors or their property on account of such Claims, debts or liabilities, other than to enforce any right to a distribution pursuant to the Plan; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Debtor, the Reorganized Debtors or their property; (c) creating, perfecting, or enforcing any encumbrance or lien of any kind against any Debtor, the Reorganized Debtors or their property; (d) asserting any right or setoff, subrogation, or recoupment of any kind against any obligation due the Debtors, the Reorganized Debtors or against their property; and (e) performing any act, in any manner, in any place whatsoever, that does not conform to or comply with, or is inconsistent with, the provisions of the Plan; provided, however, that each Creditor and holder of a disputed claim may continue to prosecute its Proof of Claim in the Bankruptcy Court and any creditor and holders of Claims shall be entitled to enforce their rights under the Plan and any agreements executed or delivered pursuant to or in connection with the Plan. The foregoing injunction shall extend to any successor of any Debtors (including, without limitation, the Reorganized Debtors) and their respective property and interests in property. If allowed by the Bankruptcy Court, any entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' and experts' fees and disbursements, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

## H. Retention of Jurisdiction

After confirmation of the Plan, the Bankruptcy Court will retain jurisdiction to the extent provided by 28 U.S.C. §1334. Basically, this means that the Bankruptcy Court will retain jurisdiction over matters relating to the Plan and to rule on any matters which are pending in the case.

## I. Post-Confirmation Procedure

After confirmation of the Plan, the Bankruptcy Court will rule upon any objections to claims and applications for compensation of professionals. Once the Bankruptcy Court has ruled upon these matters, the Debtors will file an application for final decree. The Debtor will be required to pay U.S. Trustee fees and file quarterly post-confirmation reports until such time as a final decree is entered and the case is closed.

## VI.    **ALTERNATIVES TO THE DEBTOR'S PLAN**

The alternatives to the Debtor's Plan of Reorganization in this case are: (a) conversion to a chapter 7 liquidation; (b) dismissal of the bankruptcy case and (c) sale of the Apartment Complexes during chapter 11 under §363 of the Bankruptcy Code.

A.    **Conversion**

The Debtors do not believe that conversion to Chapter 7 is in the best interest of creditors. Conversion will almost definitely result in no payments to other creditors. In all likelihood, the lenders will be able to move for relief from the automatic stay and foreclose on Debtors' only tangible assets (the Apartment Complexes and associated personal property) as they have a mortgage lien on these assets. Even assuming a chapter 7 Trustee was willing to operate the Apartment Complexes (which is unlikely) and could convince the Bankruptcy Court to permit the chapter 7 Trustee to market the Apartment Complexes, it is probable that the chapter 7 Trustee would only be able to sell at a very distressed sale price. Even assuming the chapter 7 Trustee nets some money from the sale of the Apartment Complexes, it is virtually a foregone conclusion that the loans and chapter 7 and chapter 11 administrative expenses of the case will exceed this net sum. *See also* Liquidation Analysis, supra at IV(C).

B.    **Dismissal**

The Debtors also do not believe that dismissal of this bankruptcy case is in the best interest of creditors. If the case is dismissed, the lenders would likely foreclose on the Apartment Complexes and there would be no distribution to other creditors.

C.    **363 Sale**

The Debtors intends to continue their efforts to sell the Apartment Complexes during the chapter 11 case to pay creditors, as an alternative to the Plan.

## VII.    RELATIONSHIP OF DEBTOR WITH AFFILIATES

Under the Bankruptcy Code, the term "affiliate" refers to an entity that directly or indirectly controls with power to vote 20% or more of the securities of the Debtor, a corporation 20% or more of whose outstanding voting securities are directly or indirectly controlled by the Debtor, a person whose business is operated under a lease or operating agreement by a Debtor or a person substantially all of whose property is operated under an operating agreement with the Debtor or an entity that operates the business or substantially all of the property of the Debtor under a lease or operating agreement.

Under this definition, it is possible that the Debtors general partner Omni GP LLC, its managing member, Greg Hall, and its other member, Betty Hall, would be considered affiliates.

If the Plan is confirmed, the existing ownership and management structure of the Debtors will remain intact.

## VIII.    TAX CONSEQUENCES

The transactions contemplated by the confirmation of the Plan may have an impact on the tax treatment received with respect to distributions under the Plan. That impact may be adverse to the creditor or interest holder.

An analysis of federal income tax consequence of the Plan to creditors, interest holder, and the Debtors requires a review of the Internal Revenue Code ("IRS Code"), the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice. The Plan and its related tax consequences are complex. The Debtors have not requested a ruling from the Internal Revenue Service with respect to these matters. Accordingly, no assurance can be given as to the IRS's interpretation of this Plan.

The federal income tax consequences of the implementation of the Plan to a creditor will depend in part on whether, for federal income tax purposes, the obligation from which a creditor's claim arose constitutes a "security." The determination as to whether an obligation for which a creditor's claim arose constitutes a "security" for federal income tax purposes is complex. It depends on the facts and circumstances surrounding the origin and nature of the obligation. Generally, corporate debt obligations evidenced by written instruments with maturities, when issued five (5) years or less, or arising out of the extension of trade credit, do not constitute "securities," whereas corporate debt obligations evidenced by written instruments with original maturities over (10) years or more constitute "securities." Although it appears that most of the creditors' claims do not constitute "securities," the Debtors and their professionals express no view with respect to whether the obligation for which a particular creditor's claim arose constitutes a "security" for federal income tax purposes. Creditors are urged to consult their own tax advisor in this regard.

Generally, creditors whose claims arise from obligations that do not constitute "securities" or whose claims are for wages or services, will be fully taxable exchanges for federal income tax purposes. Such creditors who receive solely cash in discharge of their claims will recognize gain or loss, as the case may be, equal to the difference between (i) the amount realized by the creditor in respect of its claim (other than any claim for accrued interest) and (ii) the creditor's tax basis in its claim (other than any claim for accrued interest). For federal income tax purposes, the "amount realized" by a creditor who receives solely cash in discharge of its claim will be the amount of cash received by such creditor. Where gain or loss is recognized by a creditor, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the creditor, whether the obligation from which a claim arose has been held for more than six (6) months, and whether and to what extent the creditor has previously claimed a bad debt deduction. The capital gains deduction for individuals and the alternate tax for corporate net capital gains have been repealed and capital gain is currently taxed to individuals and corporations at their respective maximum tax rates. However, the definitions of long-term and short-term capital gain or loss have to be repealed.

Generally, to the extent any amount received (where cash or other property) by a creditor is received in discharge of interest accrued on its claim during its holding period, such amount will be taxable to the creditor as interest income (if not previously included in the creditor's gross income). Conversely, a creditor will recognize a deductible loss (or, possible, a write-off against a reserve for bad debts) to the extent any interest accrued on its claim was previously included in the creditor's gross income and is not paid in full.

**THE TRANSACTION CONTEMPLATED BY THE CONFIRMATION OF THE PLAN MAY HAVE AN IMPACT ON THE TAX TREATMENT OF ANY CREDITOR OR EQUITY INTEREST HOLDER. THAT IMPACT MAY BE ADVERSE TO THE CREDITOR OR EQUITY INTEREST HOLDER. NOTHING HEREIN IS INTENDED TO BE ADVICE OR OPINION AS TO THE TAX IMPACT OF THE PLAN ON ANY INDIVIDUAL CREDITOR OR EQUITY INTEREST HOLDER. EACH CREDITOR AND EQUITY INTEREST**

**HOLDER IS CAUTIONED TO OBTAIN INDEPENDENT AND COMPETENT TAX ADVICE PRIOR TO VOTING ON THE PLAN.**

## IX.    PENDING AND POTENTIAL LITIGATION

### A.    Avoidance Actions

There are several types of "avoidance actions" established by the Bankruptcy Code for the benefit of debtors, including: actions to recover avoidable preferences under §547 of the Bankruptcy Code; actions to recover fraudulent conveyances under §§ 544 and 548 of the Bankruptcy Code, actions to recover unauthorized post-petition transfers under §549 of the Bankruptcy Code, and actions to invalidate and avoid liens under §§ 544 and/or 545 of the Bankruptcy Code.

Included in the Statement of Financial Affairs on file with the Bankruptcy Court and available for review by interested parties is a disclosure of payments and transfers made to creditors by the Debtors within 90 days of the bankruptcy filing as well as other required disclosures. At the present time, the Debtors do not intend to pursue any preference or fraudulent conveyance actions as the Plan proposes to pay all creditors in full and it is questionable whether the Debtors were ever insolvent. The Debtors and Reorganized Debtors do intend to evaluate and pursue, if appropriate, avoidance of claims to the extent warranted under existing law including those listed on attached Exhibit 4. However, the Debtors (prior to the Effective Date) and Reorganized Debtors (after the Effective Date) reserve the right to pursue any and all causes of action arising under the Bankruptcy Code and applicable law against any persons, and the Plan preserves such rights.

### B.    Other Litigation

The Debtors are not aware of any significant potential non-bankruptcy claims and causes of action that the Debtors have against third parties, other than the Belfor suit.

### C.    Preservation of Claims

The net proceeds, if any, from potential claims of the Debtors are speculative and uncertain and therefore no value has been assigned to any recoveries. Furthermore, it should not be assumed that because any existing or potential litigation claim has not yet been pursued or may not fall within the list above that any such claim has been waived. While the Debtor has attempted to identify claims which may be pursued, its investigation is ongoing and the failure to list any potential or existing claim generally or specifically is not intended to limit the rights of the Debtors or Reorganized Debtors to pursue any such action. Unless a claim against any person or entity is expressly waived, relinquished, released, compromised or settled as provided or identified in the Plan or any Confirmation Order, the Debtors and the Reorganized Debtors expressly reserve all claims for later adjudication. Therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such claim upon or after the confirmation or consummation of the Plan.

All claims of any kind or character whatsoever owed to the Debtors by third parties or against third parties in favor of the Debtors or the Debtors' estate to the extent not specifically compromised and released pursuant to the Plan, will be preserved and retained by the Reorganized Debtors for

and against third parties, whether currently known or unknown. Only those claims specifically and expressly compromised and released pursuant to the Plan are excepted from the foregoing.

### X.    <u>SOLICITATION OF VOTES</u>

The Debtors have devoted substantial effort to preparation of their Plan of Reorganization. The Debtors believe that the Plan represents a fair adjustment of their relationship with the creditors and will result in payment in full to creditors. The Debtors believe that the Plan is far superior to a liquidation of or foreclosure on Lion's Run and Lookout Ridge Apartment Complexes by their secured lenders, Comm 2015-CCRE22 E. Ctral Texas Expy LLC and LB-UBS 2007-C2 Lookout Ridge Boulevard, LLC, which likely would result in no recovery by other creditors. Therefore, the Debtor requests that all creditors vote in favor of its Amended Plan of Reorganization.

Dated: June 26, 2017

PLAN PROPONENT:

Omni Lion's Run, L.P. and
Omni Lookout Ridge, LP
By Omni Lookout GP, LLC, the sole general
partner

By: */s/Drew Hall*
    By: Drew Hall, Manager

Guarantor

By: */s/Gregory Hall*
    Gregory Hall, Individually


DRAFTED and APPROVED:

*/s/Ron Satija*
Ron Satija
HAJJAR PETERS LLP
State Bar No. 24039158
3144 Bee Caves Rd
Austin, Texas 78746
512.637.4956
512.637.4958 (fax)
rsatija@legalstrategy.com

PROPOSED ATTORNEY FOR OMNI
LOOKOUT RIDGE, L.P., AND OMNI
LION'S RUN, L.P., DEBTORS IN
POSSESSION